In re **TEMP–WAY CORPORATION, Debtor.**

**DYNAFORCE CORPORATION, Plaintiff,**

v.

**TEMP–WAY CORPORATION and R.M. Shoemaker Co., Defendants.**

Bankruptcy No. 87–01561S.

Adv. No. 87–0785S.

United States Bankruptcy Court, E.D. Pennsylvania.

Dec. 17, 1987.

Janet M. Sonnenfeld, Michael Power, Phila., Pa., for defendant/Temp–Way Corp.

Christopher Lee, Phila., Pa., for plaintiff/Dynaforce Corp.

Doug Candeub, Phila., Pa., for defendant/R.M. Shoemaker Co.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

The primary issue before us in the instant proceeding concerns the construction of 11 U.S.C. § 541(a)(1) and 11 U.S.C. § 541(d) with respect to a check issued by a general contractor and which has been made payable to two parties, a material-man and a sub-contractor-installer, the latter of whom is also a debtor-in-possession. The questions presented are whether the check is property of the estate pursuant to § 541(a)(1), and, assuming that it is, the extent of the debtor-in-possession's interest in that check pursuant to § 541(d). We hold that the check is property of the estate, but that the Debtor's lack of any equitable interest in the check requires that its proceeds be paid over to the materialman. We also award a modest sum of $460.00 attorneys' fees to the general contractor for its services expended in its interpleader of the check proceeds.

These issues arise in the context of this adversarial proceeding, filed on August 28, 1987, by the Plaintiff, Dynaforce Corporation (hereinafter referred to as "the Plaintiff"), the materialman, against Temp–Way Corporation (hereinafter referred to as "the Debtor"), and R.M. Shoemaker Co. (hereinafter referred to as "Shoemaker"), the general contractor and issuer of the check in question. The Debtor filed an Answer as well as a Crossclaim against Shoemaker for payment of the funds in question to the Debtor.[1] Shoemaker filed its Answer to the Complaint and a Counterclaim for Interpleader. Trial of this matter took place on November 3, 1987, at which time the Plaintiff filed a Motion to Discharge Shoemaker from the Action and Shoemaker filed a request for an Award of Attorney's Fees as a consequence of its Interpleader action. After a brief trial in which testimony of only one witness was offered, we entered a briefing schedule allowing the Plaintiff an opportunity to file a supplemental brief by November 10, 1987, and the Defendants until November 17, 1987, to respond. Briefs were duly filed by the Plaintiff and Shoemaker. However, a

---

1. The Debtor had already filed a separate adversary Complaint for Turnover on August 21, 1987, against, *inter alia,* Shoemaker for recovery of $132,375.63 for services rendered in connection with the project in question, for which it was allegedly not paid. *Temp–Way Corp. v. R.M. Shoemaker, et al,* Adversary No. 87–0773S. The present procedural posture of Adv. No. 87–0773S is somewhat confused as a result of the Debtor having named five (5) defendants in what appears to be totally unrelated account receivable claims and because two other defendants have successfully moved to withdraw the reference of the claims against them to the District Court. Shoemaker has answered and not sought to withdraw the reference. Two other defendants have not answered. This matter has been scheduled for trial, on a "must-be-tried" basis, on December 22, 1987.

Stipulation was then filed allowing the Debtor until November 26, 1987, to file its response. The Debtor's response was not filed until December 2, 1987.

Although the underlying facts are not in dispute, we are presenting this Opinion in the form of Findings of Fact and Conclusions of Law as required by Bankruptcy Rule 7052 and Federal Rule of Civil Procedure 52(a).

## FINDINGS OF FACT

1. The Plaintiff is a manufacturer and supplier of certain equipment. On or about June 10, 1986, the Plaintiff agreed to provide to the Debtor various equipment, including air curtains, at a price of $34,500.00, for installation in United Parcel Service's Brandywine Industrial Park Project (hereinafter referred to as "the UPS Project") in West Chester, Pennsylvania.

2. Shoemaker was the general contractor on the UPS Project and the Debtor was a sub contractor, whose only function was to install said equipment at the UPS Project.

3. The only testimony presented in this hearing was that of Paul J. Catan, Jr., former Chief Executive Officer of the Plaintiff from February, 1980, until August 31, 1987. Mr. Catan is now retired. We find his testimony to be credible.

4. The Plaintiff had not had any previous dealings with the Debtor and, as a standard procedure for an order of this size, Mr. Catan had a credit check performed on the Debtor.

5. Upon the Plaintiff's receipt of a poor or unsatisfactory credit rating for the Debtor, Mr. Catan contacted the Debtor and dealt with Martin Spellman, an officer of the Debtor.

6. The substance of the communication between the Plaintiff and the Debtor was that the Plaintiff needed a guarantee of payment or it would not supply the equipment.

7. A document captioned "Joint Check Agreement," signed by Denis J. Spellman, President of the Debtor, on November 25, 1986, and by Laurie Mott, Project Engineer for Shoemaker, on November 26, 1986, was sent to the Plaintiff. It provided, *inter alia*, that in consideration of the Plaintiff's furnishing equipment for installation at the UPS Project, Shoemaker agreed to pay the full amount of the Plaintiff's invoice, not to exceed $34,500.00, by means of a check jointly payable to the Debtor and the Plaintiff. It also provided that Shoemaker would hold the check for the Debtor's endorsement and that the check could then be picked up by the Plaintiff.

8. The Plaintiff had no hand in the drafting of the Joint Check Agreement. However, believing it to be satisfactory, the Plaintiff provided the equipment to the Debtor and sent an invoice or bill dated January 30, 1987.

9. In early March, 1987, the Plaintiff contacted the Debtor and Shoemaker to inquire whether the equipment had been successfully installed and about payment.

10. On March 13, 1987, Shoemaker issued a check in the amount of $34,500.00 payable jointly to the Debtor and the Plaintiff. Despite efforts by the Plaintiff to persuade the Debtor to endorse said check for payment of equipment provided by the Plaintiff, the Debtor did not endorse said check. The check remained in the possession and control of Shoemaker.

11. On April 1, 1987, the Debtor filed a Chapter 11 petition for relief.

12. At the same time that Shoemaker filed its Counterclaim for Interpleader, which was on or about October 23, 1987, it obtained an Order allowing it to deposit the sum of $34,500.00 into an interest-bearing account with the Registry of this Court.

## CONCLUSIONS OF LAW

1. The check in the amount of $34,500.00 issued by Shoemaker, payable jointly to the Plaintiff and the Debtor, although at all times in the possession of Shoemaker, is property of the Debtor's estate.

2. The $34,500.00 which was deposited into the Registry of this Court by Shoemaker upon the filing of its Counterclaim for Interpleader represents the funds pay-

able under the Joint Check Arrangement, and, as such, is property of the estate.

3. The Debtor's beneficial interest in said funds is limited to bare legal title and the Plaintiff, alone, has equitable title in these funds.

4. The Joint Check Arrangement creates an affirmative duty on the part of Shoemaker to pay the Plaintiff's invoice for the precise amount at issue, $34,500.00, in the form of a check payable to both the Debtor and the Plaintiff.

5. The Debtor had no rights to said check; the Debtor had an affirmative duty to endorse the check for the payment of the Plaintiff's invoice.

6. Shoemaker performed its affirmative duties and is not in breach of any obligation to the Plaintiff.

7. The Debtor is in breach of its affirmative duty to endorse the check.

8. Shoemaker is entitled to be discharged from liability to the Debtor and the Plaintiff for the deposited $34,500.00.

9. Shoemaker is entitled to payment of attorney's fees in the amount of $460.00 from the funds on deposit with the Court on the basis of its having proceeded upon an interpleader action as a Counterclaim.

10. The Plaintiff is entitled to the remainder of the funds on deposit ($34,500.00 less $460.00), plus interest accrued upon the funds since the date of their deposit with the court.

## DISCUSSION

■ We recently had occasion to address the breadth of the definition in 11 U.S.C. § 541(a) as to what constitutes "property of the estate" in *In re Ford,* 78 B.R. 729, 735 (Bankr.E.D.Pa.1987). There, we recognized the broad scope of what is includable in the Debtor's estate by reference to the unanimous decision of the United States Supreme Court in *United States v. Whit-*

*ing Pools, Inc.,* 462 U.S. 198, 204–05, 103 S.Ct. 2309, 2313, 76 L.Ed.2d 515 (1983), which stated:

§ 541(a)(1) provides that the "estate is comprised of all the following property, wherever located: ... all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1) (1976 ed, Supp v). The House and Senate Reports on the Bankruptcy Code indicate that § 541(a)(1)'s scope is broad. Most important, in the context of this case, § 541(a)(1) is intended to include in the estate any property made available to the estate by other provisions of the Bankruptcy Code. *See* H.R.Rep No. 95–595, p. 367 (1977) (footnotes omitted).

*Accord, Mid–Atlantic Supply v. Three Rivers Aluminum Co.,* 790 F.2d 1121, 1124 (4th Cir.1986); *In re N.S. Garrott & Sons,* 772 F.2d 462, 465–66 (8th Cir.1985); *Georgia Pacific Corp. v. Sigma Service Corp.,* 712 F.2d 962, 965–68 (5th Cir.1983).

Having previously adopted a broad reading of § 541(a) in *Ford, supra,*[2] and in *In re Mason,*[3] 69 B.R. 876, 882–84 (Bankr.E.D. Pa.1987), we have no hesitancy in holding that the instant joint check or the funds which have now been deposited into this Court are property of the Debtor's estate.

■ It is axiomatic, however, that what rights the Debtor has in property of the estate are qualified by § 541(d), which provides in pertinent part as follows:

Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, ..., becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

2. In *Ford,* we held that funds which were paid into the state court by the Debtor's credit union and then charged to the Debtor's account were property of the estate.

3. In *Mason,* we held that rent money placed by a tenant into "escrow" in a bank account in her name alone pending a landlord-tenant appeal, and which were then paid over to the landlord, were recoverable by the tenant as a preferential transfer based upon our determination that said monies were property of the estate.

The facts of the instant case require us to hold that the extent of the Debtor's interest in the joint check is limited to bare legal title and that the Plaintiff, alone, has an equitable interest in the joint check and the funds that it represents. Our examination of the Joint Check Agreement and the testimony which we heard form the basis of our holding. *In toto,* the Joint Check Agreement provides as follows:

> In consideration of DYNAFORCE CORPORATION furnishing equipment to us through our subcontractor TEMP–WAY CORPORATION for installation in the UNITED PARCEL SERVICE, BRANDYWINE INDUSTRIAL PARK PROJECT, we agree to pay the full amount of DYNAFORCE CORPORATION invoice(s) to a total not to exceed $34,500.00 (plus tax if applicable) by check(s) jointly payable to our subcontractor and DYNAFORCE CORPORATION not later than 30 days from the date of the invoice(s) for said equipment. It is expressly understood that DYNAFORCE CORPORATION does not waive any rights accorded to it by law as a material supplier on this project.
>
> No checks are to be mailed, they will be picked up by DYNAFORCE CORPORATION at the office of R.M. Shoemaker, Inc., after TEMP–WAY CORPORATION has endorsed them.

| Confirmed and Accepted: | PRIME CONTRACTOR OR OWNER |
| --- | --- |
| TEMP–WAY CORPORATION | R. M. Shoemaker Co. |
| Subcontractor | BY /s/ Laurie Mott |
| BY /s/ | Title Project Engineer |
| Denis J. Spellman, Pres. | |
| | Address 245 South 24th St. |
| DATE: 11-25-86 | |
| | City Philadelphia |
| | State & Zip Pa. 19103 |
| | DATE: 11-26-86 |

First of all, the Joint Check Agreement was created so as to induce the Plaintiff to supply equipment to Shoemaker through the Debtor. Secondly, the Agreement creates an affirmative obligation on the part of Shoemaker to pay the Plaintiff's invoice for the provision of equipment. Thirdly, and most importantly, the Agreement completely supports the Plaintiff's assertion that the Debtor had no rights in the joint check; to wit: the check was never even in the possession of the Debtor, and the language of the last sentence of the Agreement presumes and confirms the Debtor's agreement to simply endorse the check for the Plaintiff's pick up at Shoemaker's office. Lastly, we do not find the Plaintiff's failure to waive any of its rights as a supplier to be material in the determination of the Plaintiff's equitable title or rights in the joint check.

There are several decisions from various jurisdictions which specifically involve joint checks or very similar situations, that support our holding. *Georgia Pacific, supra,* is the seminal decision concerning joint checks decided after the enactment of the Bankruptcy Code. The facts are similar to the instant case insofar as it concerned checks made jointly payable to the debtor, Sigma, as subcontractor, and to materialmen by the general contractor. However, the drawing of joint checks there appears to have been a unilateral and gratuitous request by Sigma which was complied with by the general contractor. There was certainly no affirmative duty on Sigma's part to endorse the checks over to its materialmen except to the same extent that there is any duty to pay one's creditors. Moreover, Sigma received possession of said checks and did not pass them on to the materialmen.

In *Georgia Pacific,* the Fifth Circuit Court of Appeals agreed with the bankruptcy court's analysis that the debtor had at least legal title to the joint checks, and, therefore, held them to be a part of the debtor's estate which were required to be turned over to the administrator of the debtor's estate. However, Court also clearly recognized that the extent and nature of the debtor's interest in the joint checks was subject to the bankruptcy court's determination of the competing equitable interests of the joint payees vis-a-vis the debtor pursuant to 11 U.S.C. § 541(d). The Court also acknowledged that *had* it recognized the equitable interests of the materialmen, then, "perhaps, the debtor-in-possession's sole permissable administrative act with regard thereto

would be to pay over or endorse the sums due to the beneficial owners of the property." *Id.* at 968. However, the Court rejected the district court's acceptance of the theory in which the district court had concluded that the money had never become property of the estate because of a constructive trust on behalf of the materialmen. The Court went on to state summarily that the materialmen had no protected equitable interest arising out of the joint check arrangement.

It is at this juncture where we find the facts of *Georgia Pacific* to be distinguishable from the case *sub judice,* such that we have determined the Plaintiff to have a protected equitable interest in the joint check so as to require payment of its proceeds to the Plaintiff. As stated previously, we have found possession of the check by the Plaintiff and the existence of affirmative duties by Shoemaker and the Debtor to be very significant to our holding.

Our analysis of the facts herein, resulting in our determination that the Plaintiff has equitable title to the joint check, obviates the necessity of any reliance on a constructive trust analysis, which several courts have adopted. *See, e.g., Mid–Atlantic Supply, supra,* 790 F.2d 1121; *Garrott & Sons, supra,* 772 F.2d 462; and *In re American International Airways, Inc.,* 44 B.R. 143 (Bankr.E.D.Pa.1984) (hereinafter referred to as *"AIA I"*). However, these cases demonstrate that constructive trusts have been "imposed whenever necessary to satisfy equity." *AIA I,* 44 B.R. at 146. As we have stated previously, we view trusts "as tantamount to giving preference to particular creditors in bankruptcy distribution, and thus we believe that their recognition should be sparingly legitimized." *In re Miller's Auto Supplies,* 75 B.R. 676, 679 (Bankr.E.D.Pa.1987). Fortuitously, then, we need not adopt the constructive trust analysis to resolve the case under consideration. *See also In re Rimmer Corp., Zimmerman v. Commonwealth of Pennsylvania,* 80 B.R. 337, 338–39 (Bankr.E.D.Pa. 1987); and *In re American International Airways, Inc.,* 70 B.R. 102, 105 (Bankr.E. D.Pa.1987).

However, these cases utilizing a constructive trust analysis are instructive, as the facts parallel those under consideration so closely as to convince us of the propriety of our decision herein. For example, in *Mid–Atlantic,* after the debtor/subcontractor, Mid–Atlantic, and its supplier, Traco, had come to an agreement about a job, Traco learned of Mid–Atlantic's poor credit rating. Initially, Traco would only agree to accept an order from Mid–Atlantic on a cash basis. Finally, Traco agreed it would accept the order but only on one of three arrangements. The third option, which was the one chosen, was "to arrange for a joint check arrangement through a suitable creditor on the project [obviously, the primary contractor, Lawson], an arrangement which would assure that 'the monies would come through a joint check arrangement and would be within the control of Traco.' " *Mid–Atlantic, supra,* 790 F.2d at 1123. Traco was still unwilling to go forward until Lawson itself agreed to be bound by the arrangement in writing. After Lawson signed the required letter, Mid–Atlantic commenced work on the order.

Upon completion of Mid–Atlantic's contractual responsibilities, Lawson issued a check payable jointly to Mid–Atlantic and Traco, which was sent to Mid–Atlantic for endorsement. At the same time, Lawson issued a separate check, payable only to Mid–Atlantic for its work. On the same day that Mid–Atlantic received these checks, it filed its Chapter 11 petition.

The distinguishing factor from the case *sub judice* is obviously *the possession* of the joint check. Consequently, the Fourth Circuit in *Mid–Atlantic* relies on a constructive trust analysis in order to arrive at the equitable result of entitling Traco to receive and retain the proceeds of the joint check. We believe that the fact that the parties' arrangement was much more than a unilateral act by Mid–Atlantic to request a joint check, being in fact a valid and binding obligation to obtain such a check, placed an affirmative duty on both Lawson and Mid–Atlantic to do so, and was instrumental to the holding by the *Mid–Atlantic* court. Here, similarly, an obligation to ac-

cept a joint check was created by the Joint Check Agreement.

A similar factual scenerio occurred in *In re Sun Belt Electrical Constructors, Inc.,* 56 B.R. 686 (Bankr.N.D.Ga.1986), but in quite a different procedural posture. In *Sun Belt,* the matter was presented in the context of whether certain contracts were executory; whether the contracts should be enforced; or whether rejection of the contracts should be approved. Sun Belt was a debtor/contractor who purchased materials from a company named M & M and used them to perform work for two other companies, Joe N. Guy Co. and Flagler Co. Pursuant to the respective contracts, both Guy and Flagler agreed to make payments for construction work by checks jointly payable to both Sun Belt and M & M. In return for this agreement, M & M agreed not to pursue its lien rights. After coming to the conclusion that the subject contracts were executory, the court held that, where the joint check agreement includes a provision whereby the supplier agrees to refrain from filing its liens, the funds do not become property of the estate.

The *Sun Belt* court went on to look at whether the rejection of the executory contract would benefit general unsecured creditors. Finding that neither Sun Belt nor its creditors would benefit from rejection of the contracts since the funds were not property of the estate, the court refused to approve rejection of the contracts. Although the court concluded that the debtor's only permissible act would be to endorse the checks over to M & M or to abandon the checks, the court refrained from so ordering because of the procedural posture of the case.

Although the analysis relied upon in *Sun Belt* is startlingly at variance with our analysis here, as well as that which is relied upon in *Georgia Pacific, supra,* and

*Mid–Atlantic, supra,* we believe that it is noteworthy because, upon concluding that the Debtor merely held bare legal title in the joint check, the court stated that the only permissable act for the debtor would be to endorse the check over to M & M. Similarly, we believe that, despite our determination that the joint check is property of the estate of the instant Debtor, the Debtor must endorse said check over to the Plaintiff.[4]

█ Having determined that the $34,-500.00 [5] is payable to the Plaintiff, we turn to Shoemaker's claim for $2,645.00 in attorney's fees arising out of its Counterclaim for Interpleader. The prevailing principle, in interpleader actions brought in federal courts, "is that it is within the discretion of the court to award the stakeholder costs, including reasonable attorney's fees, out of the deposited fund." 3A J. MOORE, FEDERAL PRACTICE, ¶ 22.16[2], at 22–169 (2d ed. 1987). *See also Massachusetts Mutual Life Insurance Co. v. Central Penn National Bank,* 372 F.Supp. 1027 (E.D.Pa. 1974). The underlying rationale for an award of counsel fees is that the stakeholder's involvement is not as a result of any "wrongdoing but rather because he is the mutual target in a dispute which is not of his own making." 3A J. MOORE, FEDERAL PRACTICE, *supra,* at 22–173. The great weight of authority supports such awards. *See id.* at 22–168 to 22–183 (citations omitted).

However, such an award is likely to be nominal, *id.* at 22–174 (citations omitted), because "the only services for which compensation is normally sought are those connected with the preparation and filing of a single pleading [for interpleader]." *Id.* at 22–173. As was aptly stated by the Court in *Hunter v. Federal Life Insurance Co.,* 111 F.2d 551, 557 (8th Cir.1940):

> We do not believe that there has been any delay attributable to Shoemaker which would justify an award or pre-deposit interest, *cf. In re Art Shirt, Ltd., Inc.,* 68 B.R. 316, 325 (Bankr.E.D.Pa. 1986), such as the presence of a prior state court judgment in favor of the claimants entitled to the funds, as in *Fidelity Bank, supra,* 592 F.Supp. at 521–24.

---

**4.** Of course, the fact that Shoemaker deposited the contested funds into the Registry of the Court eliminates the necessity of ordering such an endorsement by the Debtor.

**5.** The Plaintiff is entitled to receive all accrued interest on the interpleaded fund. *Fidelity Bank v. Commonwealth Marine and General Assurance Co.,* 592 F.Supp. 513, 524 (E.D.Pa.1984).

Under ordinary circumstances there would be no justification for seriously depleting the fund deposited in court by a stakeholder through the allowance of large fees to his counsel. The institution of a suit in interpleader, including the depositing of the fund in the registry of the court and procuring of an order of discharge of the stakeholder from further liability, does not usually involve any great amount of skill, labor or responsibility, and, while a completely disinterested stakeholder should not ordinarily be out of pocket for the necessary expenses and attorney's fees incurred by him, the amount allowed for such fees should be modest.

We find that a modest award of $460.00, which represents four hours of attorney's time at the rate of $115.00 per hour, is very reasonable for the services provided, as opposed to the $2,645.00 requested by Shoemaker. We believe that it was not necessary for Shoemaker to have participated in the briefing or in the trial, and it appears to have done so principally to protect its rights to attorney's fees. We agree with the previously cited authorities that the only services properly compensable from the deposited funds are those for preparation and filing of the interpleader action, along with time associated with the deposit of the funds in court. Shoemaker's counsel includes time associated with extended analysis of Shoemaker's options and extended preparation for its agent's deposition, which appear excessive. Further, no fees incurred principally in pursuit of attorney's fees are collectible, especially since the fees are payable out of the fund-in-court to which the innocent Plaintiff is entitled. *Cf. In re J.A. & L.C. Brown Co.,* 75 B.R. 539, 540 (E.D.Pa.1987); and *In re Shaffer–Gordon Associates, Inc.,* 68 B.R. 344, 347–50 (Bankr.E.D.Pa.1986) (compensation from debtor's estate for time expended in preparation of fee applications are disallowed).

We also find ourselves in agreement with the decision to award a lesser amount than requested in *Shrepic v. Metropolitan Life Ins. Co.,* 120 F.Supp. 650 (W.D.Pa.1954). We believe that Shoemaker's "right to

costs must be balanced against the true beneficiary's (Plaintiff, herein) right to the full amount." *Id.* at 653. Hence, we exercise our discretion to award Shoemaker fees of $460.00 from the deposited funds.