In re TEMP–WAY CORPORATION, Debtor.

TEMP–WAY CORPORATION, Plaintiff,

v.

R.M. SHOEMAKER COMPANY, John S. McQuade Company, Nason and Cullen, Incorporated, Walters Mechanical and W.S. Cumly & Sons, Defendants.

Bankruptcy No. 87–01561S.
Adv. No. 87–0773S.

United States Bankruptcy Court, E.D. Pennsylvania.

Feb. 19, 1988.

748

Janet Sonnenfeld, Michael Power, Philadelphia, Pa., for debtor.

Douglas N. Candeub, Philadelphia, Pa., for defendant R.M. Shoemaker Co.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION AND PROCEDURAL HISTORY

This is an adversarial proceeding in which a contracting firm operating as a Chapter 11 debtor-in-possession sought to collect five separate and apparently unrelated accounts receivable from five Defendants. All that remains before us for disposition is a dispute between the Debtor, a sub-contractor in the construction of a facility for the United Parcel Service (hereinafter referred to as "UPS") in West Chester, Pennsylvania, and R.M. SHOE-MAKER COMPANY, the general contractor on the project (hereinafter referred to as "the Defendant"). The specific dispute revolves around the meaning and enforcibility of a particular clause in the sub-contract. The general contractor argues that this clause allows it to withhold payment from the Debtor unless and until the Debtor pays the materialmen on the project. We believe that the clause does so provide

and is enforcible against the Debtor. Therefore, we shall grant the general contractor's request to pay most of the sums sought by the Debtor directly to the materialmen.

The underlying Chapter 11 case was filed by the Debtor on April 1, 1987. The instant adversary proceeding, commenced on August 21, 1987, is one of several such proceedings filed by the Debtor to collect accounts receivable. The odd feature of these proceedings is that, in each, the defendants are named in clusters of five parties which appear to have no relationship to each other. Thus, in this proceeding, five defendants are named, and yet there is no apparent connection between the claims against the Defendant and the other parties named as defendants other than the fact that the Debtor has claims against them all. Rather remarkably, no party moved to sever the claims against it from the others. However, upon motion by two of the other defendants named herein, JOHN S. McQUADE CO. and NASON & CULLEN, INC., the District Court, on October 26, 1987, withdrew the reference to this court of the Debtor's claims against them. A default judgment was entered against another, WALTERS MECHANICAL. The dispute with the final defendant, W.S. CUMLY & SONS, was reported settled. None of the dispositions of the Debtor's claims against any of the co-defendants has had any perceptible impact on the Debtor's claim against the Defendant.

There have, however, been other proceedings before us which do bear a relationship to the UPS project and these parties. On December 17, 1987, we issued a written Opinion in Adversary No. 87-0785S, 80 B.R. 699, a proceeding initiated against the Debtor and the Defendant by a materialman, in which we required the Debtor to forfeit the proceeds of a joint check agreement to the materialman. Another almost identical proceeding, instituted by another materialman in district court and transferred to this court as Adversary No. 88-0007S, constituted part of the sum in issue here. Given our disposition in Adversary No. 87-0785S, 80 B.R. 699, the Debtor has withdrawn its claim as to that

portion of the sum in question involving a joint-check agreement with that material-man, and those involving several similar much smaller joint-check agreements.

The relevant portion of the instant portion of the instant proceeding came before us for trial on January 7, 1988. At that time, per the parties' agreement, we issued an Order directing them to prepare a Stipulation of Facts which would constitute a case stated and Briefs supporting their respective positions thereafter. Unfortunately, the parties could not agree on the wording of the entire Stipulation, and we were compelled to conduct a trial on January 27, 1988. At that time, the principals of each of the parties testified as to their particular understanding of the contract clause in issue. Thereafter, the parties submitted Briefs on February 5, 1988, and February 12, 1988.

Although most of the facts were indeed the subject matter of the written Stipulation, we are required by Bankruptcy Rule 7052 and Federal Rule of Civil Procedure 52(a) to submit our result in the form of Findings of Fact (much of what will incorporate the parties' Stipulation), Conlusions of Law, and a Discussion.

## B. FINDINGS OF FACT

1. The Defendant was the general contractor in the construction of a Parcel Distribution Center for UPS in West Chester, Pensylvania. The Debtor was a subcontractor on the UPS Project, furnishing and installing all heating, ventilation, air conditioning equipment, and gas piping to the facility constructed.

2. The original contract price for the Subcontract, dated May 28, 1986, was $398,000.00, but this figure was reduced by certain payments by the Defendant, including the joint checks in issue in Adversary No. 88–0007S. The amount presently at issue is agreed to be only $45,831.53.

3. The parties also agree that, since the Debtor has given a warranty on the work it performed which extends until May, 1988, it is reasonable for the Defendant to withhold $5,000.00 from any final payment until the expiration of the warranty period.

4. In issue are obligations of the Debtor to six materialmen on the UPS project, none of which had joint check arrangements with other parties hereto and which remain unpaid in amounts totalling $42,-820.59.

5. These six materialmen have put the Defendant on notice that they have not been paid by the Debtor, and they have sent it copies of their invoices or billing information.

6. The Defendant is withholding final payment to the Debtor because it claims that the Debtor failed to satisfy certain alleged requirements of Article VII of the subcontract, including the Debtor's failures to supply a final invoice and to furnish a final Release of Liens, which the Debtor has stated it would supply; and the Debtor's failure to furnish certification that it has paid all materialmen in connection with the Subcontract, which the Debtor stated that it will not supply and contends that it need not supply as a condition for payment.

7. Article VII of the Subcontract providesd as follows:

> ARTICLE VII Final Payment. Final payment hereunder is subject to the following conditions: (1) The Subcontractor shall have delivered to the Contractor a written certification of the full performance of all of the Subcontractor's obligations, including a schedule of all outstanding vendors accounts, under such Subcontract, together with such guarantees of the Subcontractor as may be called for under such Subcontract; and (2) The Architect shall have delivered to the Contractor and Owner a certificate of completion approving the work done and/or materials furnished, the full performance of the terms the Subcontract by the Subcontractor and the payment in full of the Subcontract price; and (3) Owner shall have accepted the Project; and (4) Subcontractor shall have submitted a fully executed Release of Liens on a form furnished by the Contractor.

8. Dennis Spellman, the President of the Debtor, testified that, although the Subcontract was a form prepared by the

Defendant, he had read and was aware of this particular provision. However, he stated that, on past jobs where the Debtor was a subcontractor of the Defendant, in which the same contract form was used, the Debtor had been paid by the Defendant before the Debtor had paid its suppliers or materialmen. He also stated that a subcontractor could not pay his suppliers or materialmen until the subcontractor received payment from the contractor.

9. Mr. Spellman did not, however, indicate that, in the instant situation, the Debtor would pass payments received from the Defendant along to the suppliers or materialmen if it were paid. In fact, all indications were that this would not happen.

10. Dale Wark, the Chief Financial Officer of the Defendant, testified that the contract form was prepared by its counsel and had been used by the Defendant on over 1,500 jobs without any objection to, or confusion with, the language of Article VII.

11. Mr. Wark made reference to Item 12.11 of the conditions of the General Contract between UPS and it, incorporated as an Exhibit to the Subcontract, which states: "Contractor shall pay all subcontractors and suppliers promptly." However, there was no evidence to rebut Mr. Spellman's testimony that the General Contract was not attached to the Subcontract when Mr. Spellman signed it, and that the Debtor had not been supplied with a copy of the General Contract at the time of its execution of the Subcontract.

12. On questioning from the court, Mr. Wark indicated that there were five reasons why he believed it important to the Defendant, as general contractor, to see to it that suppliers and materialmen were paid by its sub-contractors: (1) It protected the Defendant itself from liability to the materialmen; (2) It protected the owner from liability to the materialmen; (3) It prevented materialmen from making claims against the Defendant on any payment bonds; (4) It maintained the Defendant's good relationships with suppliers and materialmen; and (5) It inspired confidence in the Defendant, which would result in better pricing on future jobs involving the same parties.

13. Mr. Wark agreed that no suppliers or materialmen could assert any mechanic's liens against UPS or the Defendant, and admitted that the Defendant had paid the Debtor before receiving assurances that the Debtor had paid its materialmen on previous jobs. However, the Debtor's present lack of good financial health and the strong probability that here, unlike the other jobs, the Debtor would not pay the materialmen, had prompted its action to demand payment to the materialmen as a pre-condition for payment to the Debtor.

14. There was no indication that the parties had a gross disparity of bargaining power in their contract negotiations, or that Article VII of the Subcontract constituted an adhesion contract.

## C. CONCLUSIONS OF LAW

1. Requiring, as it does, that the Debtor certify "full performance" of "all" obligations to its vendors, Article VII of the Sub-contract unambiguously requires that payment of materialmen is a condition of the Defendant's payments to the Debtor.

2. The terms of an unambiguous contract must be enforced as written where gross disparity of bargaining power or an adhesion contract situation is absent. Article VII may therefore be enforced by the Defendant to require the Debtor's payment to its materialmen as a pre-condition of the Defendant's payment to the Debtor.

3. The Defendant's articulated purpose of preserving good future relationships with suppliers on contracts where it is the general contractor has been recognized by the Pennsylvania Supreme Court as sufficient to render the requirement that the Debtor pay its materialmen a material term of the parties' contract and therefore enforcible.

4. Judgment will be entered for the Defendant, allowing it permission requested by it to pay the $42,820.59 due to the suppliers and materialmen directly to them.

## D. DISCUSSION

The initial argument of the Debtor is that Article VII of the Subcontract, by its terms, does not require that it pay its materialmen as a pre-condition of receipt of payment from the Defendant. The Debtor argues that the contract is very specific in requiring it to produce a schedule of vendors to the Defendant and far less specific in requiring payment to the vendors as a pre-condition for payment. The Debtor argues that it is nonsensical to require it to produce a schedule of vendors if payment to the vendors itself is required.

It is perhaps true that the Subcontract could have been drafted more clearly. However, the terms of Article VII of the Subcontract require the subcontractor to provide "a written certification of the *full performance* of *all* of the Subcontractor's obligations" (emphasis added) just before stating that such performance includes providing a schedule of vendors accounts together with any guarantees. It therefore appears that the specific reference to the schedules may have been added as a means of requiring the Subcontractor to gather together all guarantees for the contractor, which might otherwise not be considered to be within the scope of the subcontractor's obligations. We are at a loss to see how it could be concluded that "full performance" of "all" of the subcontractor's obligations does *not* include the obligations of the subcontractor to pay its materialmen.

■ The Debtor argues that the contract provision in issue is ambiguous, and that the ambiguity as to whether payment of materialmen by the Debtor is a prerequisite to receipt of payment from the Defendant must be construed against the Defendant, as the draftsperson of the form contract. *See, e.g., In re Leedy Mortgage Co.,* 76 B.R. 440, 445–46 (Bankr.E.D.Pa.1987); *In re Tashjian,* 72 B.R. 968, 976 (Bankr.E. D.Pa.1987); and *In re United Nesco Container Corp.,* 68 B.R. 970, 974 (Bankr.E.D. Pa.1987).

However, in order for this principle to arise, there must be a genuine ambiguity in the contract. As we stated in *In re CG Realty Investments, Inc.,* 79 B.R. 249, 252 (Bankr.E.D.Pa.1987), "[a] court may not, by the medium of interpretation, effectively rewrite an unambiguous contract." *See also, e.g., In re Penn Central Transportation Co.,* 831 F.2d 1221, 1225–28 (3d Cir. 1987); *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1009–14 (3d Cir.1980); *Rusiski v. Pribonic,* 511 Pa. 383, 390, 515 A.2d 507, 510 (1986); and *Mears, Inc. v. National Basic Sensors, Inc.,* 337 Pa.Super. 284, 289–90, 486 A.2d 1335, 1338 (1985), *rev'd on other grounds,* 510 Pa. 61, 507 A.2d 32 (1986).

There is also a category of cases involving contracting parties having grossly disparate bargaining power, where the courts have disallowed the draftsperson's imposing an adhesion contract upon the other contracting party. In such a circumstance, the court may decline to enforce even an unambiguous contract. *See, e.g., Fuentes v. Shevin,* 407 U.S. 67, 94–96, 92 S.Ct. 1983, 2001–02, 32 L.Ed.2d 556 (1972); and *Tashjian, supra,* 72 B.R. at 976.

Here, however, there was no perceptible great gulf in the relative bargaining positions of the parties here. Both were represented in negotiations by knowledgeable businesspersons, who had done similar business with each other in the past. There is no evidence of overreaching on the part of the Defendant, or the imposition of an adhesion contract upon the Debtor by the Defendant.

■ The record does present evidence of a subjective misunderstanding as to what Article VII of the Subcontract meant, kindled by the fact that the Defendant had not enforced this provision strictly against the Debtor in any of their prior contractual relationships. However, a contract between two parties with relatively equal bargaining power is manifested by what the contract language states and the application of the law to that language, irrespective of the subjective beliefs or misunderstandings of either party or of even both parties thereto as to what it means. *See, e.g., Provident Trust Co. v. Metropolitan Casualty Insurance Co.,* 152 F.2d 875, 878–79 & n. 12 (3d Cir.1945), *cert. denied,* 327 U.S. 789, 66 S.Ct. 810, 90 L.Ed. 1015

(1946); *Severance v. Heyl & Patterson, Inc.*, 308 Pa. 101, 108–09, 162 A. 171, 173 (1932); and 17 AM.JUR.2d 633–35 (1964).

■ The argument that the Defendant waived the requirement that the Debtor make full payment to suppliers by not enforcing such provisions in prior contracts between the parties is not persuasive. Waiver of a legal right is established only by proof of a "clear, unequivocal, and decisive action of the party having such a right showing a purpose to surrender such right on his part." *Envirex, Inc. v. Ecological Recovery Associates, Inc.*, 454 F.Supp. 1329, 1338 (M.D.Pa.1978), *aff'd*, 601 F.2d 574 (3d Cir.1979). In the obvious absence of any proof of such a clear, unequivocal and direct action, the Debtor is relegated to attempting to establish an "implied waiver" of the contract terms by the Defendant.

In Pennsylvania, however, "the doctrine of implied waiver ... applies only to situations involving circumstances equivalent to an estoppel, and the person claiming the waiver to prevail must show *that he was misled and prejudiced thereby....*" *Brown v. City of Pittsburgh*, 409 Pa. 357, 360–61, 186 A.2d 399, 401 (1962) (emphasis in original) (citations and footnote omitted). *Goodwin v. Hartford Life Insurance Co.*, 491 F.2d 332, 333 n. 1 (3d Cir.1974). *Schifalacqua v. CNA Insurance*, 567 F.2d 1255, 1258 (3d Cir.1977) (acceptance of one late payment of insurance premium does not waiver subsequent late payments). *See also Van Riper v. Equitable Life Assurance Society*, 561 F.Supp. 26, 34 (E.D.Pa. 1982), *aff'd*, 707 F.2d 1397 (3d Cir.1983).

Here, there is no evidence of any clear, unequivocal, and decisive act of the Defendant indicating its intention to waive its contract right to withhold payments to the Debtor pending its payment to the materialmen. Further, the Debtor is unable to show any actions undertaken by it which indicated that it was misled or prejudiced by the Defendant's past actions, and hence that it acted in detrimental reliance upon a belief that the contract did not require it to prepay its materialmen. Certainly, there is no principle of law providing that a contract provision is invalidated merely because of its past non-user.

Hence, we hold that the contract manifests a clear intention of the parties that the Defendant may withhold payment if the Debtor fails to perform all of its obligations to its materialmen, including making payment to them. The Defendant is entitled to enforce the contract as written.

The second, alternative argument of the Debtor is that, even if the terms of the contract do include a requirement of prepayment, these terms are not material and hence are unenforcible against it. This argument causes us to consider the reasons why performance of the particular contract provision in issue is important to the parties.

When asked by the court why the Defendant would concern itself with the relationships between its subcontractors and their materialmen, Mr. Wark of the Defendant articulated five reasons, recited by us at Finding of Fact 12, page 7, *supra.* We are not convinced that any of the first three reasons have much force. As we indicated in a previous decision, it is unlikely that the materialmen here could assert a viable cause of action against either the owner (UPS) or the Defendant directly for the Debtor's non-payment to them, due to a lack of contractual privity. *See In re DSC Industries, Inc.*, 79 B.R. 244, 248 (Bankr.E. D.Pa.1987). The parties apparently agree that the materialmen could not assert a mechanic's lien against the realty, and there is no evidence that there are any rights which the materialmen actually have against the Defendant on account of any bond issued in their favor.

However, the desire to develop and maintain good relationships with suppliers, the substance of the last two reasons for such a contract provision recited by Mr. Wark, are precisely the sort of considerations which the Supreme Court of Pennsylvania deemed sufficient to save a provision similar to Article VII of the subcontract from an attack of lack of materiality in *Williard, Inc. v. Powertherm Corp.*, 497 Pa. 628, 634, 444 A.2d 93, 97 (1982).

The Debtor attempts to blunt the impact of *Williard* by pointing out that the contract clause in issue there specifically and unambiguously allowed an owner to retain funds due to subcontractors from the general contractor. This is true. However, we have determined that the contract clause in issue here was equally as effective as the contract provision in issue in *Williard* to allow the Defendant to require pre-payment of materialmen by the Debtor as a condition for its own payment. On the issue of materiality, *Williard* presents a precedent which we are prepared to follow.

The reasoning of *Williard* also answers the Debtor's argument that it is impractical to require a subcontractor to pay its materialmen before it can be paid. *Williard* establishes that if a contract clause so provides, it is material and will be so enforced. *Compare In re J.A. Clark Mechanical, Inc.*, 80 B.R. 430, 433 (Bankr.N.D.Ohio 1987) (*"absent* a lien or *contractual liability*, an owner of improved property is not liable for a subcontractor's debt with respect to work on its property") (emphasis added).

Certainly, it does not strike us as inequitable to see the materialmen on the UPS job paid directly by the Defendant, rather than effecting the intended passing of these funds through the Debtor, which obviously will be impeded by the Debtor's bankruptcy. As the Defendant rather astutely points out, we allowed a general contractor to make the same kind of allowance to a party who had performed services for a subcontractor in *In re Tubular Products, Inc.*, 69 B.R. 582, 585 (Bankr.E.D.Pa. 1987) (Defendant contractor allowed to deduct sums due to Arrow Steel Window Corp. for Debtor-Subcontractor's stair system from the amount due to the Debtor).

However, we must acknowledge that there is another consideration in a bankruptcy situation not addressed directly by either party here. It is uncertain that all or even many of the Debtor's creditors will be paid in full at the conclusion of this case. Why, then, should the materialmen receive preferential payments, as they will when the Defendant makes its proposed remittances to them? The parties to this suit can be conceptualized as standing in the shoes of equally deserving and innocent other parties contesting the distribution of the funds of the Debtor's estate, the Debtor in the shoes of the general creditors other than the materialman and the Defendant in the shoes of the materialmen.

As our decisions in *In re Rimmer Corp.*, 80 B.R. 337, 338–39 (Bankr.E.D.Pa.1987); *In re Miller's Auto Supplies, Inc.*, 75 B.R. 676 (Bankr.E.D.Pa.1987); and *In re American International Airways, Inc.*, 70 B.R. 102, 105 (Bankr.E.D.Pa.1987), make clear, we are not inclined to allow creditors to utilize a trust theory as a means of obtaining preferential treatment in a bankruptcy. Nevertheless, our own previous decision in Adversary No. 87–0785S, 80 B.R. 699 in this case and the decision of the Court of Appeals in *In re Gebco Investment Corp.*, 641 F.2d 143 (3d Cir.1981), suggest that the equities of materialmen involved in a dispute with general creditors over their right to recovery of funds set aside in some fashion for their particular benefit is rather strong. *Cf. Pearlman v. Reliance Insurance Co.*, 371 U.S. 132, 141–42, 83 S.Ct. 232, 237, 9 L.Ed.2d 190 (1962). We are therefore inclined to rule in favor of such parties when a device such as a joint check is established to set aside funds to protect them, as in Adversary No. 87–0785S, 80 B.R. 699. Here, the only protective device is the Defendant's contractual provisions in their favor. We shall allow the Defendant to invoke such a provision here, especially since the case was argued strictly as a matter of contract law, of which the Defendant had the better of the argument. Whether we would reach the same result on suit of the materialmen themselves as a matter of bankruptcy law is expressly not decided here.

Our Order will therefore require the Defendant to submit the $42,280.59 in issue directly to the materialmen and suppliers and to pay the balance of $3,010.94 to the Debtor upon expiration of the warranty period in May, 1988, as the Defendant

**754**

agreed that the Order should read in the event that it prevailed.