In re CAPITAL CENTER
EQUITIES, Debtor.

CAPITAL CENTER EQUITIES,
Plaintiff,

v.

ESTATE OF William GORDON, Michael
Kulzer and Mark G. Wolkoff,
Executors, Defendants.

Bankruptcy No. 91–13286S.
Adv. No. 91–0793S.

United States Bankruptcy Court,
E.D. Pennsylvania.

March 13, 1992.

Daniel Morman, Philadelphia, Pa., for debtor.

Steven P. Burkett, Levy, Angstreich, Finney, Mann, Baldante & Burkette, P.C., Philadelphia, Pa., for defendants.

Frederic Baker, Philadelphia, Pa., Asst. U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The instant proceeding involves, principally, the efforts of CAPITAL CENTER EQUITIES ("the Debtor") to avoid the purported title and rent claim of the ESTATE OF WILLIAM GORDON ("the Estate") and its co-executors, MICHAEL KULZER, Esquire ("Kulzer"), and MARK G. WOLKOFF, Esquire ("Wolkoff") (collectively, the Estate, Kulzer, and Wolkoff shall be termed "the Defendant"), in reference to the Debtor's sole asset, a strip shopping center located in Lower Allen Township, Cumberland County, PA, known as Capital Center ("the Property"). In addition, the Debtor seeks relief from a New Jersey state court order preventing it from transferring or encumbering the Property and damages from the Defendant. The creative Debtor raises numerous alternative grounds for avoidance of the Estate's title and/or security interest in the Property under state law, i.e., the transaction between the parties was a loan, not actually a sale and leaseback, as referenced in the documents (an issue which is given great prominence by the parties); the repurchase agreement effected a defeasance of the deed; and the late William Gordon ("Gordon"), the Estate's decedent, failed to pay transfer taxes. However, the court finds that the Debtor is entitled to avoid the transfer of the Property to Gordon and any security interest asserted by the Estate against the Property, and is entitled to relief from the Estate's claim as well as the state court order, which are both based upon the validity of the Estate's title to the Property, on the basis of 11 U.S.C. § 544(a). Therefore, we need not and do not reach the pertinent state law issues except to find that the Debtor has not proven any rights to recovery of any damages against the Defendant.

### B. PROCEDURAL HISTORY

On June 13, 1991, the Debtor filed a voluntary petition for bankruptcy relief under Chapter 11 of the Bankruptcy Code. Little has occurred in this case that has not been related to this proceeding, which is not surprising, since this proceeding concerns the title to the Debtor's only asset. Anticipating a quicker resolution of this proceeding than has transpired due to extensive efforts to settle it, see pages 603–604 infra, we entered an Order on November 14, 1991, directing the Debtor to file a Plan of Reorganization and an accompanying Disclosure Statement on or before February 3, 1992. When the proceeding was not resolved by late January, the Debtor moved to extend these deadlines and, by an Order of February 6, 1992, the date for the filing of the Plan and Disclosure Statement was extended until April 1, 1992. The instant resolution of this proceeding should permit the Debtor to meet the extended deadline.

On its Schedules, the Debtor listed the Estate as a disputed creditor with a claim in an unspecified amount. On August 8, 1991, the Estate filed the Claim in the amount of "approximately" $32,633.33 (since the sum allegedly continues to accrue) representing unpaid rent under the Lease.

On August 28, 1991, the Debtor filed the Complaint in the instant proceeding, asserting the following claims in eight Counts:

1. An objection to the Estate's Claim for unpaid rent, because it disputed the Estate's title to the Property;

2. Avoidance of any transfer made to Gordon under 11 U.S.C. § 544(a)(3);

3. A declaration that the alleged sale/leaseback transaction which is the basis of the Estate's claim was a loan or financing device, under which the Debtor has fully satisfied its obligations and is, in fact, owed a refund; and, further, that the Estate's demand as a result of the "loan" is

usurious, unconscionable, and unenforcible under Pennsylvania law, and usurious and violative of "a New Jersey criminal [usury] statute;"

4. "Rescission" of an Order, dated February 25, 1991, and issued by the New Jersey Superior Court, Camden County, Chancery Division ("the N.J. Court"), Docket No. C00025–91 ("the N.J. Order"), which enjoined the Debtor from transferring, selling, conveying, mortgaging, or otherwise disposing of the Property;

5. Avoidance of any statutory lien which the Estate might have against the Debtor for unpaid rent, under 11 U.S.C. § 545 ("§ 545");

6. & 7. Avoidance of any transfer or obligation of the Debtor to the Estate under 11 U.S.C. §§ 544(a)(1) (Count VI) and 544(a)(2) (Count VII); and

8. A declaration that the Estate's "interpretation" of the transaction, which would obligate the Debtor to "repurchase" the Property for $875,000 subject to a first mortgage of Hamilton Bank ("the Bank") is "incorrect, unfair and unconscionable."

The trial of the Complaint was originally scheduled on October 23, 1991. On September 25, 1991, the Defendant filed an Amended Answer which denied all of the Debtor's material averments. As to Count I, the Defendant averred that the transaction in issue was not a loan, but rather was in fact a legitimate sale/leaseback transaction, as reflected in the appropriate documents. As to Count II, the Defendant denied that § 544(a)(3) was applicable, since Gordon was a *bona fide* purchaser of the Property, as evidenced by the Debtor's delivery of a deed of the Property to Gordon to an escrow agent. The Defendant answered Count III by averring that the transaction *was* a sale/leaseback, as reflected in the appropriate documents, and that the Estate has not made a claim for interest. With respect to Count IV, the Defendant stated that the Debtor subjected itself to the jurisdiction of the N.J. Court and was bound by its Decree. As to Counts V through VIII, the Defendant either stated that no answer was required or summarily denied each of the Debtor's

averments. The Defendant also appended eight affirmative defenses to the Amended Answer, including a contention that the Debtor's claims "are inadmissible under the Pennsylvania Dead Man's Statute," 42 Pa.C.S. § 5930 ("the DMA").

On October 23, 1991, the court granted the Defendant's contested motion for a continuance, and rescheduled the trial on November 7, 1991. After a trial which extended into the evening of that date, this court entered an Order of November 8, 1991, giving the parties an opportunity to file Proposed Findings of Facts and Conclusions of Law by November 21, 1991 (the Debtor), and December 5, 1991 (the Defendant).

The proceeding was then listed for a settlement conference on December 13, 1991, before the Honorable Judith H. Wizmur of the District of New Jersey, specially assigned to assist this court with its large workload. Efforts by Judge Wizmur continued into January, 1992, resulting in a postponement of the Defendant's post-trial submission until January 27, 1992. The parties opted to attend a further settlement conference before Judge Wizmur on February 21, 1992. Prospects for settlement were reported bright until on or about March 3, 1992, when we were advised by Judge Wizmur that the settlement negotiations had broken off. We then proceeded to prepare this Opinion.

## C. FACTUAL HISTORY

The Debtor is a Pennsylvania partnership with offices located at 115 N. Jackson Street, P.O. Box 525, Media, Delaware County, PA, 19063. From its inception in 1983, its partners have been George Diemer ("Diemer") and Robert Pacilli ("Pacilli").

The Debtor was formed as a vehicle to develop and to operate a strip shopping center, known as Capital Center, which is located in Lower Allen Township, Cumberland County, PA., presumably deriving its name from proximity to Pennsylvania's state capital. The construction of the Property was financed by a loan from Fidelity Bank. Permanent financing was

provided by Hamilton Bank ("Hamilton") and secured by a mortgage ("the Mortgage") and a mortgage note ("the Note") in the amount of $600,000.00. Diemer and Pacilli were, and remain, personally liable on the Note. Pursuant to the terms of the Mortgage, Capital could not transfer the mortgaged property without the prior written consent of Hamilton.

Diemer testified that he needed an additional $200,000 to complete construction of the Center. He therefore approached Gordon, a long-time acquaintance who had provided financing for previous Diemer/Pacilli business ventures and was described rather uncharitably by Diemer as a "Shylock lender." Richard S. Goldberg, a real estate broker licensed in Pennsylvania and New Jersey, initially brought the idea of investing in the Property to Gordon, who was, like Diemer, a New Jersey resident. On December 7, 1983, Diemer, Pacilli, and Gordon memorialized the transaction ("the Transaction"), termed a sale/leaseback transaction, by executing the following documents:

(1) Sale/Leaseback Agreement ("the Agreement");

(2) Lease ("the Lease Agreement");

(3) Re-purchase Agreement;

(4) Addendum to the Repurchase Agreement ("Addendum I");

(5) Second Addendum to the Repurchase Agreement ("Addendum II");

(6) Escrow Agreement; and

(7) Memorandum of Sale/Leaseback Agreement ("the Memorandum").

Pursuant to the terms of the Agreement, Gordon was to pay $10,000.00 upon its execution; another $100,000.00 on the date of its closing; and additional $55,000.00 installments within 120 and 180 days of the closing, respectively. The record is suggestive, but inconclusive, on the issue of whether Gordon actually paid the full $220,000.00 "purchase price." Wolkoff, an attorney who was Gordon's son-in-law and apparently represented Gordon during his lifetime, stated that Gordon had paid the full purchase price. Diemer concurred. However, Kulzer, an attorney associated with the New Jersey law firm which had represented Diemer in other business ventures involving other realty partnerships, was very reserved in his testimony on this issue, stating that there was no evidence that Gordon had paid the full purchase price. The uncertainty which pervades this rather basic issue is indicative of the informal nature of the entire transaction.

Under the terms of the Agreement, the Debtor conveyed all of its interests in the Property to Gordon, subject to the interest of Hamilton, but was reassigned its possessory rights upon the leaseback of the Property. The Agreement was referenced by, and interrelated to, the Lease and the Repurchase Agreement and its amendments related to the Transaction. The Agreement further recited that, if the appropriate deed ("the Deed") were not deliverable, the Debtor was required to return to Gordon the $10,000.00 deposited upon execution of the Agreement and both parties would be released from further liability.

The Lease Agreement, per letters between counsel, apparently was to extend for a ten-year term after December 7, 1983. During the lease term, the Debtor was to pay "minimum annual rent" of $27,500.00 in year one; $28,600.00 for years two through four; $30,800 for years five through seven; and $33,000.00 for years eight through ten. The Debtor also was required to pay additional "rent" to cover real estate taxes, the monthly Mortgage payment to Hamilton, assessments, water rates and charges, and other governmental levies and charges.

The Re-purchase Agreement contemplated, like the Agreement, that the Deed be delivered to the Debtor and enabled Gordon "to compel" the Debtor to repurchase the Property. If the Debtor failed to exercise its repurchase option, it would be required to pay to Gordon a "minimum annual rent" of $55,000.00, and, also, mortgage payments and other fees, costs, and charges as specified in the Lease. Kulzer testified that, if the repurchase option had been exercised, the rate of return to Gordon would be twenty-five (25%) percent after taxes.

Entered into evidence were two versions of the Re-purchase Agreement, both of which contain the following language:

> The re-purchase price for the Subject Property, and all buildings and improvements erected thereon, shall be Eight Hundred and Seventy–Five Thousand Dollars ($875,000.00), in cash, certified bank check, or in a form acceptable to Gordon.

However, the versions differ in the location of a caret and in the resultant variant interpretations by the Debtor and the Defendant of the price referenced therein. In one version, the caret appears directly after the word "Gordon," while the other version places the caret after an illegible scribble following the word "Gordon." There is a dispute as to whether the language referenced by the caret (which language does not appear in the Re-purchase Agreement) clarified whether the re-purchase price included Hamilton's mortgage or was over and above it.

Pursuant to Addenda I and II, the Debtor's performance under the terms of the Re-purchase Agreement was secured by mortgages given to Gordon on other properties owned by an entity referenced as "Pobad" and another unspecified partnership, both of which were entities in which Diemer and Pacilli were partners.

The Escrow Agreement stated that the Deed should be held by Stewart Title Insurance Company ("Stewart") until other arrangements were made by written agreement of the Debtor and Gordon. As of the date of the hearing, the Deed had not been recorded, and Stewart continued to hold it. There was disputed testimony as to whether the parties had wanted the Deed to be transferred in any event.

In any event, the Deed was given to Stewart and was not filed or recorded. By the terms of the Escrow Agreement, if such an agreement to transfer the Deed were later made, the Debtor and Gordon would share equal responsibility for the payment of real estate transfer taxes associated with the recordation of the Deed. However, the transfer taxes were never paid.

The Memorandum was also executed by the parties and it, rather than the Deed, *was* recorded. The Memorandum states, in pertinent part, that the Debtor had entered into a

> written Sale/Leaseback Agreement, dated December 7, 1983, with William Gordon ..., as Buyer, covering the sale and leaseback of the [Property] ... the purchase price for which is to be paid in installments over a period of seven (7) years ...
>
> The premises are CONVEYED ... and shall be UNDER AND SUBJECT TO the restriction, covenants and conditions so set forth in the said Agreement.
>
> The interest in the premises acquired by [Gordon] under the said Agreement is subordinate to a Mortgage on the premises created on November 22, 1983 ... in favor of Hamilton Bank ...
>
> THIS MEMORANDUM, is intended for recording purposes only, and does not supercede [sic], diminish, add to or change the terms of the said Agreement....

Attached to the Memorandum was a description of the Property.

Following completion of the Transaction, Gordon and the Estate took substantial federal income tax depreciation deductions due to his/its ownership of the Property. For example, in the years 1986 through 1991, excluding 1990, depreciation deductions in the amount of $174,714.00 were taken.

From Wolkoff's testimony, it appears that the entire Transaction was heavily secured. In addition to the alleged security interest in the Property for the Agreement, the Re-purchase Agreement was secured by mortgages on two unrelated properties. Wolkoff also testified that, pursuant to the Escrow Agreement, Gordon was prevented from obtaining possession of the Deed. Most likely, Wolkoff was referring to the provision in the Escrow Agreement which kept the Deed in the possession of Stewart until both Gordon and the Debtor agreed to another arrangement.

In April, 1988, Gordon died. Diemer stated, as verified from a ledger sheet en-

tered into evidence by the Defendant, that "rental" payments continued to made by the Debtor after Gordon's death. A month later, in a letter dated May 11, 1988, Diemer wrote to Wolkoff. Therein, Diemer stated that, before his death, he had spoken to Gordon about the possibility of repurchasing the Property, as well as another unrelated property, prior to the established repurchase date. Diemer went on to state that, a month before his death, Gordon had told him that he would "get back to [him] and advise [him] if he [Gordon] could reduce the repurchase prices," since the repurchase rights were being exercised before the repurchase date.

On August 19, 1988, Diemer wrote the following letter to Kulzer:

> Pursuant to our recent conversation, I am currently in a position to repurchase the shopping center known as Capital Center Equities from the Estate of William Gordon.
>
> When we originally made the deal in December 1983, it was agreed that I would repurchase the property for $875,000 over the mortgage balance on or before 1993. This gave me a period of ten years to repurchase the property at a profit of $875,000 or $87,500 per year. I would propose that I repurchase the property on or before December 1988 at a price of $437,500 over the mortgage balance at that time. This is a direct proration of the price and I believe is fair to all parties.
>
> Please let me hear from you as soon as possible as it will require some time for me to solidify my end of the proposal.

Recognizing that the contents of this letter contradict his contentions that the Transaction was not in the nature of a sale/leaseback, and that the $875,000 price for the Property included assumption of Hamilton's mortgage, Diemer testified that he had drafted the letter as a result of a telephone call from Kulzer in which Kulzer, who he testified that he believed was acting on his behalf, had dictated the letter to him. Diemer further stated that he did not remember the details of the Transaction, and, therefore, he was susceptible to Kulzer's directives. Kulzer totally denied Diemer's version of these events and stated that he received the letter in the course of negotiations with Diemer. Further, Kulzer stated that he rejected the proposal because he had believed, given the then-current rate of return on money lent, it was more advantageous for the Estate to require performance consistent with the Sale/Leaseback documents than to agree to this pay off.

Diemer did concede that, in August, 1988, he had wanted to "unwind" the Transaction while there was still value in the Property and a "good" real estate market, in order that the Debtor could take advantage of an opportunity to refinance the Mortgage and sell the Property. Using a ten-year discounted income approach, Diemer testified, without rebuttal, that the present value of the Property is $787,719.00. However, in August, 1988, Diemer stated that the value of the Property was approximately $1,000,000.00 to $1,500,000.00.

A meeting was held on July 26, 1989, in an attempt to settle the dispute between the parties. At that meeting, Diemer, for the first time on record, contended that the Transaction was actually a loan, rather than a sale/leaseback, and he offered to merely repay the $220,000 rather than remit $437,500 to the Estate for the Property, as he had done in the letter of August 19, 1988. There appears to have been another unsuccessful meeting between the parties to attempt to resolve the dispute in December, 1989. Despite the on-going dispute between the parties, the Debtor continued to maintain its "lease payments" to the Estate until October, 1990. After that date, the Debtor, having made about $286,000 in total payments, ceased doing so.

In light of the continuing refusal by the Estate to accept its offer to repay the $220,000, Diemer testified that he initiated the proceedings in the N.J. Court to try to force the Estate to take the $220,000.00 and cancel the Estate's interest in the Property. In an Order dated February 25, 1991, the Honorable Paul A. Lowengrub entered

the N.J. Order, which provides in pertinent part as follows:

> Defendant, Estate of William Gordon, be and hereby is enjoined from commencing any proceedings regarding any matter concerning the within action in any other state; and
>
> ... [the Debtor] and George M. Diemer are enjoined and restrained from transferring, selling, conveying, mortgaging or otherwise disposing the Property ... until further Order of this Court; and
>
> ... that [the Debtor] and George M. Diemer continue to pay all the expenses required of it to be paid under the Lease Agreement ... including all mortgage payments, real estate taxes, assessments, water rates and water charges, other governmental levies, insurance, as well as maintain the property in accordance with the terms of the Lease Agreement; ....

There is no evidence that there has not been compliance with this Order. Several months later, there having been no further developments in the N.J. Court, the Debtor filed its instant bankruptcy case.

**1.** The DMA only applies as to a claim or defense "as to which state law supplies the rule of decision." Federal Rule of Evidence 601. The Debtor's claims based upon the characterization of a relationship of the Debtor and Gordon as buyer-seller or lender-borrower are clearly state law claims. *Compare In re Groshans,* 114 B.R. 258, 260 (D.Colo.1990) (dischargeability proceeding is *not* within the scope of analogue of DMA), *with In re Diamond Furnishing Co.,* 42 B.R. 638, 640 (Bankr.M.D. Pa.1984) (accounts receivable action in bankruptcy court *is* within the scope of the DMA).
Contrary to the Defendant's contentions, the application of the DMA to Diemer's testimony does not bar him absolutely from testifying, nor does it bar the Debtor from making any particular claims. Rather, it bars only the testimony of any witness whose interest is adverse to a decedent as to matters in which neither the decedent nor the decedent's representatives are in a position to refute the testimony because of the decedent's death. *See In re Estate of Hall,* 517 Pa. 115, 131 n. 4, 535 A.2d 47, 54 n. 4 (1987). Diemer would therefore be the only trial witness possibly incompetent to testify and even he would be incompetent to testify only as to the relatively narrow scope of facts which could only be refuted by Gordon's testimony.

## D. DISCUSSION/CONCLUSIONS OF LAW

### 1. OVERVIEW: IN ORDER TO RULE ON THE DEBTOR'S CLAIMS UNDER 11 U.S.C. § 544(a), IT IS NECESSARY ONLY TO CONSIDER UNDISPUTED FACTS OF RECORD.

During the trial of this proceeding, the parties, and this court as well, became fixated upon the seductive issue of whether the transaction in issue was a *bona fide* sale/leaseback, as it appears from review of the documentation, or was actually a loan structured as a sale/leaseback in order to accommodate and provide federal income tax advantages to Gordon, as appears likely from consideration of the relative circumstances of the parties.

Much of the testimony of Diemer was directed towards this issue. In anticipation of this testimony, the Defendant raised the issue of the admissibility of this testimony under the DMA. There would be very difficult issues which this court would be compelled to resolve if a decision had to be made as to the applicability of the DMA.[1] However, rendering a decision fa-

In particular, the corroborating testimony of Rocco Nigro, Esquire ("Nigro"), a real estate attorney who had represented Diemer and the Debtor before the instant litigation and who continues to represent Diemer infrequently, is not that of "an adverse party" because Nigro does not stand to gain or lose personally from the entry of any judgment by this court. Therefore, the testimony of Nigro, as well as that of Diemer corroborated by Kulzer and Wolkoff themselves, is not rendered incompetent. In stating the facts, at pages 603–607 *supra,* assuming *arguendo* that the DMA *might* apply to some relevant claims to some extent, we have not recited or relied upon any testimony of Diemer which we believe would have been excludable under the DMA.
It is unclear whether the DMA applies at all to the Debtor's claims under § 544(a), regarding which federal law applies the ultimate "rule of decision." *Compare Groshans, supra.* However, even in considering the § 544(a) claims, in an abundance of caution, since an "element" of state law might be relevant to the "rule of decision," we have not considered any testimony from Diemer's mouth which the Defendant could have refuted were Gordon alive today.

vorable to the Debtor under § 544(a) makes resolution of these issues unnecessary.

The court candidly admits that it encouraged the misplaced focus on this issue by attaching our unreported decision addressing the issue of whether a ground lease was really a lease/executory contract in *In re Valley Forge Plaza Associates, Official Committee of Unsecured Creditors of Valley Forge Plaza Associates v. Academy Life Ins. Co.*, 1990 WL 153999 (Bankr. E.D.Pa. Oct. 10, 1990), to our Order scheduling the submission of Briefs, dated November 8, 1991, with this notation that it might be of "possible benefit" to the parties. We can only state that we recant our misdirection of the parties towards this issue.

The only facts which are significant to resolution of the controlling § 544(a) issue are the undisputed recordings of the various instruments which made up the Transaction. Very little, if any, of the testimony is relevant to this issue. Rather, this issue is susceptible to resolution mainly by examining the documents admitted into the record as exhibits.

2. GORDON'S FAILURE TO DULY RECORD THE DEED PLACING THE PROPERTY IN HIS NAME RENDERS THE TRANSFER AND SECURED OBLIGATIONS INCURRED BY THE DEBTOR IN THIS TRANSACTION AVOIDABLE UNDER 11 U.S.C. § 544(a).

■ The "strong-arm" provisions of the Bankruptcy Code, which permit a trustee, or a chapter 11 debtor-in-possession, 11 U.S.C. § 1107(a), to stand in the shoes of a hypothetical "ideal" lien creditor or judgment creditor, or a *bona fide* purchaser of a debtor's real property, are thusly set forth in 11 U.S.C. § 544(a):

§ 544. **Trustee as lien creditor and as successor to certain creditors and purchasers**

(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;

(2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; or

(3) a bona fide purchaser of real property, other fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

Several Pennsylvania statutes have long established the necessity for a grantee to record a deed of a property if that deed is to be deemed effective as to other lien creditors, judgment creditors, or *bona fide* purchasers. In 1715, legislation now codified at 21 P.S. § 621 was enacted which provided that

*[n]o deed* or mortgage, or defeasible fee, in the nature of mortgages, hereafter to be made, *shall be good or sufficient to convey* or pass any freehold or inheritance, or to grant any estate therein for life or years, *unless such deed be acknowledged or proved and recorded within six months after the date thereof,* where such lands lie, as hereinbefore directed for other deeds (emphasis added).

Later in the eighteenth century, a law now appearing as 21 P.S. § 444 provided that

*[a]ll deeds and conveyances,* which, from and after the passage of this act, shall be made and executed within this

commonwealth of or concerning any lands, tenements or hereditaments in this commonwealth, or whereby the title to the same may be in any way affected in law or equity, shall be acknowledged by the grantor, or the grantors, bargainor or bargainors, or proved by one or more of the subscribing witnesses thereto, before one of the judges of the supreme court, or before one of the judges of the court of common pleas, or recorder of deeds, prothonotary, or clerk of any court of record, justice of the peace, or notary public of the county wherein said conveyed lands lie, and *shall be recorded in the office for the recording of deeds where such lands, tenements or hereditaments are lying and being, within ninety days after the execution of such deeds or conveyance, and every such deed and conveyance* that shall at any time after the passage of this act be made and executed in this commonwealth, and *which shall not be proved and recorded as aforesaid, shall be adjudged fraudulent and void against any subsequent purchaser or mortgagee for a valid consideration, or any creditor of the grantor or bargainor in said deed of conveyance*, and all deeds and conveyances that may have been made and executed prior to the passage of this act, having been duly proved and acknowledged as now directed by law, which shall not be recorded in the office for recording of deeds in the county where said lands and tenements and hereditaments are lying and being, within ninety days after the date of the passage of this act, shall be adjudged fraudulent and void as to any subsequent purchaser for a valid consideration, or mortgagee, or creditor of the grantor, or bargainor therein (emphasis added).

A more modern, but equally definitive statute, codified at 21 P.S. § 351, was enacted in 1925 which stated that

> *[a]ll deeds, conveyances*, contracts, and other instruments of writing *wherein it shall be the intention of the parties executing the same to grant, bargain, sell, and convey any lands, tenements, or hereditaments situate in this Commonwealth,* upon being acknowledged by the parties executing the same or proved in the matter provided by the laws of this Commonwealth, *shall be recorded in the office for the recording of deeds in the county where such lands, tenements, and hereditaments are situate. Every such deed, conveyance, contract, or other instrument of writing which shall not be acknowledged or proved and recorded, as aforesaid, shall be adjudged fraudulent and void as to any subsequent bona fide purchaser or mortgagee or holder of any judgment,* duly entered in the prothonotary's office of the county in which the lands, tenements, or hereditaments are situate, without actual or constructive notice unless such deed, conveyance, contract, or instrument of writing shall be recorded, as aforesaid, before the recording of the deed or conveyance or the entry of the judgment under which such subsequent purchaser, mortgagee, or judgment creditor shall claim. Nothing contained in this act shall be construed to repeal or modify any law providing for the lien of purchase money mortgages (emphasis added).

Clearly, without any reference to the facts which testimony has proven to be disputed, it can be ascertained that the Deed of the Debtor's Property to Gordon has never been recorded, within either ninety days or six months or at any time after the purported conveyance of same on December 7, 1983. Therefore, pursuant to the clear terms of 21 P.S. § 444 and 21 P.S. § 351, the Deed is void as to any subsequent *bona fide* purchaser for a valid consideration, or any mortgagee or holder of a judgment against the Debtor, *i.e.*, the "ideal" hypothetical lienholder, judgment creditor, or *bona fide* purchaser of the Debtor's property whose presence is assumed in a § 544(a) analysis.

We recognize that, as between the Debtor on one hand and Gordon and the Estate on the other hand, outside of bankruptcy, the recording defect would not affect the validity of the Deed. *See In re Rice*, 126 B.R. 189, 192 (Bankr.E.D.Pa.1991) ("*Rice*

*I"*); *In re Aikens,* 83 B.R. 344, 347 (Bankr. E.D.Pa.1988) (*"Aikens I"*); *In re Chandler,* 76 B.R. 460, 463–64 (Bankr.E.D.Pa. 1987); *In re Morrison,* 69 B.R. 586, 590 (Bankr.E.D.Pa.1987); and *In re McLaughlin,* 28 B.R. 575, 576 (Bankr.E.D.Pa.1983). However, if that same Debtor attacks the Deed in the shoes of a trustee under § 544(a), a different result will ensue if the Defendant cannot establish that the Deed has been validly recorded. *See In re Rice,* 133 B.R. 722, 728 (Bankr.E.D.Pa.1991) (*"Rice II"*); *Rice I, supra,* 126 B.R. at 192, 194, 195; and *In re Aikens,* 94 B.R. 869, 872 (Bankr.E.D.Pa.) (*"Aikens III"*), *aff'd sub nom. In re Aikens v. City of Philadelphia,* 100 B.R. 729 (E.D.Pa.) (*"Aikens IV"*), *aff'd sub nom. McLean v. City of Philadelphia,* 891 F.2d 474 (3d Cir.1979). *See also, e.g., General Electric Credit Corp. v. Nardulli & Sons, Inc.,* 836 F.2d 184, 192–93 (3d Cir.1988); *McCannon v. Marston,* 679 F.2d 13, 15 & n. 1 (3d Cir. 1982); *In re Fisher,* 7 B.R. 490, 495–96 (W.D.Pa.1980); *In re Minichello,* 120 B.R. 17, 20 (Bankr.M.D.Pa.1990); *In re Funding Systems Asset Management Corp.,* 111 B.R. 500, 522 (Bankr.W.D.Pa.1990); and *In re Duffy–Irvine Associates,* 39 B.R. 525, 528 (Bankr.E.D.Pa.1984).

The Defendant's only counter-argument to the § 544(a) claims of the Debtor is that, although it does not (and cannot) dispute the case and statutory law recording the efficacy of an unrecorded deed, the Memorandum served to provide constructive notice, since *it* was acknowledged and recorded. The Defendant embellishes this argument by stating that the Memorandum served its purpose by providing constructive notice to subsequent lienholders, judgment creditors, and *bona fide* purchasers. It then cites *McCannon, supra,* in support of its argument that, under Pennsylvania law, the recording of the Memorandum was sufficient notice of the interests of Gordon and the Estate in the Property to overcome any negative impact of § 544(a) upon his/ its interests.

It is true that Pennsylvania law defines a *bona fide* purchaser as one who buys property (real or personal) for valuable consideration and without notice of the outstanding rights of others in the property. *Carnegie Natural Gas Co. v. Braddock,* 142 Pa.Cmwlth. 383, ——, 597 A.2d 285, 288 (1991); and *Haggerty v. Erie County Tax Claim Bureau,* 107 Pa. Cmwlth. 265, 269, 528 A.2d 681, 682–83 (1987). However, it is also clear that, where the transfer of real property is at issue, the interest of a *bona fide* purchaser, as well as that of a judgment creditor, may be superseded only by recordation of the deed to the underlying property. *See McLean, supra,* 891 F.2d at 477; *Butler v. Lomas & Nettleton Co,* 862 F.2d 1015, 1018 & n. 5 (3rd Cir.1988); *In re MacQuown,* 717 F.2d 859, 863 (3rd Cir.1983); *In re Cosper,* 106 B.R. 377, 380 (Bankr. M.D.Pa.1989); *Duffy–Irvine, supra,* 39 B.R. at 528; *Malamed v. Sedelsky,* 367 Pa. 353, 356, 80 A.2d 853, 855 (1951); *Kretschman v. Stoll,* 238 Pa.Super. 51, 58–59, 352 A.2d 439, 443–44 (1975); *Carnegie Natural Gas, supra,* 142 Pa.Cmwlth. at ——, 597 A.2d at 288; *Haggerty, supra,* 107 Pa. Cmwlth. at 269, 528 A.2d at 681; and *Land v. Pennsylvania Housing Finance Agency,* 101 Pa.Cmwlth. 179, 184, 515 A.2d 1024, 1026 (1986).

The Defendant's argument that the recording of the Memorandum satisfied the dictates of the Pennsylvania recording statutes by giving constructive notice of the Transaction is not supported by Pennsylvania law. Pennsylvania law requires more than the recordation of simply any document which purports to provide notice. As stated by long-established state law, the

> object [of recording] is to give public notice in whom title resides; so that no one may be defrauded by deceptious appearance of title. He that won't speak when justice and the law requires him to speak, must thereafter be silent when prompted by his own interest merely.

*Salter v. Reed,* 15 Pa. 260, 263 (1850). *See Mancine v. Concord–Liberty Savings & Loan Ass'n,* 299 Pa.Super. 260, 264, 445 A.2d 744, 746 (1982) (the primary reason for recording deeds is to provide public notice of title and to avoid deceptive and fraudulent appearances). *See also Reiter*

*v. Kille*, 143 F.Supp. 590, 592–93 (E.D.Pa. 1956). For this reason, recordation of the Deed, rather than the Memorandum, was obligatory to protect Gordon against subsequent claims of *bona fide* creditors, not optional, as the Defendant suggests. *Id.* at 593. Furthermore, the rationale for the existence of recording acts is not only to provide constructive notice of the existence of a transaction, but also to provide notice of the nature of the transaction. As stated in *In re Executive House Associates*, 99 B.R. 266, 272 (Bankr.E.D.Pa.1988), quoting *Jaques v. Weeks*, 7 WATTS 261 (Pa.1838),

> "[t]he great object of the recording act is to compel those who claim a priority of consequence or lien to place the true nature of the transaction on record, so that all may have recourse to it for correct information...."

Possibly because, as the Debtor alleged elsewhere, he never wished this transaction to be considered as a "real" sale, as opposed to a secured loan transaction, or possibly because he wanted to avoid payment of real estate transfer taxes, Gordon did not adhere to the requirements of 21 P.S. §§ 351, 444, 621 by the recording of the Memorandum. The Memorandum is not the Deed, which remains in escrow with Stewart. The Memorandum does little in the way of indicating in whom title of the Property resides, or of providing information of the nature of the Transaction. It merely states that the Transaction occurred. Although it is stated therein that Gordon bought the Property, there is no tangible, recorded proof that actual conveyance of title to the Property to Gordon occurred, absent recording of the Deed. Hence, the "constructive notice" supposedly afforded by the Memorandum is insufficient to meet the statutory requirements. Thus, the Debtor, standing in the shoes of the trustee under 11 U.S.C. § 1107(a), may avoid both the Estate's Deed and its "secured" interest in the Property.

Building on the premise that recordation of a deed perfects a transferee's interest against all others, including subsequent mortgagees, *bona fide* purchasers, and judgment holders, it has been held that "the transfer [of real property] should not be considered complete until it is so far perfected that no *bona fide* purchaser from the debtor-transferor and no creditor thereafter have acquired any rights in the property so transferred superior to the rights of the transfer[ee] therein." *In re Jacobs*, 60 B.R. 811, 815–16 (M.D.Pa.1985) (citations omitted). *See also MacQuown, supra*, 717 F.2d at 863; and *Cosper, supra*, 106 B.R. at 380. Therefore, it appears that the transfer of the Property to Gordon, pursuant to the Transaction, was never wholly completed, since the Deed was not recorded. We might also observe that, considering that all of the parties to the Transaction were very experienced and sophisticated purveyors in real estate, these circumstances support the Debtor's thesis that something other than a sale of the Property to Gordon was contemplated.

In further support of its argument that the Memorandum was sufficient to satisfy the requirements of § 351, the Defendant relies upon *McCannon* for the broad proposition that a transferee, in order to protect its interest, need only give actual or constructive notice of its interest in real property to potential subsequent purchasers. This reliance is misplaced. Factually, *McCannon* dealt with an "owner" of a condominium unit bought from a debtor. 679 F.2d at 14. For "a variety of reasons," settlement on the sale of the condominium unit never occurred. *Id.* As a result, the purchase agreement was never recorded. *Id.* However, the owner lived in the condominium unit for four years prior to the debtor's filing its bankruptcy petition. *Id.* The bankruptcy and district courts had ruled that the trustee could avoid the owner's interest under § 544(a)(3); the Court of Appeals reversed.

The sole basis of the Court of Appeals' decision was its finding that actual or constructive notice, via "clear and open possession" of the condominium unit, was sufficient to give notice of the owner's interest. *Id.* at 16. The condominium dweller was not required to file, or to record, any document to give constructive or actual notice

in light of her "clear and open possession" of the unit.

This reasoning cannot be successfully transposed to the instant factual matrix. As was noted in *McLean, supra,* 891 F.2d at 477, *McCannon* stands only for the general premise that a trustee may be precluded from avoiding a lien pursuant to § 544(a) where state law holds that constructive notice, of a particular type, is sufficient to put a *bona fide* purchaser on notice. *Accord, Rice II, supra,* 133 B.R. at 728; and *In re Carlyle,* 100 B.R. 217, 219 (Bankr.E.D.Pa.1989). However, the Pennsylvania recording statutes, 21 P.S. §§ 351, 444, 621, expressly require recordation of a deed to protect a grantee's interest against the "ideal" lien and judgment creditors and *bona fide* purchasers. Gordon was required to do more than record the Memorandum; he was required to record the Deed. The controversy before this court is an example of state law requiring compliance with a recording statute, such that "no act other than strict conformity with the statute in issue insulates the lien from attack by the trustee under § 544(a)(3)." *Carlyle,* 100 B.R. at 220. This court holds true to the belief expressed in *Carlyle* that "systematically overlooking a technical requirement may effectively remove the requirement from the applicable state law." *Id.* (citations omitted).

The district court, in *Aikens IV,* 100 B.R. at 732, echoed this court's misgivings in *Carlyle* and recognized that *McCannon*'s holding regarding constructive notice could not be construed broadly. In rejecting the City's argument that improperly-filed water and sewer liens constituted sufficient notice to prevent application of § 544(a), the district court upheld the integrity of strict compliance with applicable state recording statutes by holding that

> where state law has explicitly described the procedure by which a lien can be perfected, no act other than strict compliance with the recording statute will shield the City from attack by the trustee … The City would have us read *McCannon* as expanding constructive notice beyond that provided by either strict compliance with state recording law or of

clear and open possession to embrace any situation that may be sufficient to impose constructive notice on a subsequent purchaser and bar a trustee's avoidance powers. However, the doctrine of constructive notice is harsh and should be resorted to reluctantly.

*Id.*

Finally, if *McCannon* were applied to the present controversy, its facts would mitigate in favor of the Debtor in another way. *The Debtor,* not Gordon or the Estate, was in "clear and open possession" of the Property. The Debtor collected the lease payments from the tenants and paid the taxes and other fees and charges due on the Property, and tenants in the Property were referred to in leases of the Property as the "lessees," rather than "sub-lessees." Thus, for all intents and purposes, the Debtor, not Gordon, appeared to be the owner of the Property.

Therefore, this court holds that the Debtor may avoid the conveyance of any interest in the Property to Gordon pursuant to 11 U.S.C. § 544(a). In addition, any security interest of the Estate falls, as an obligation incurred by the Debtor which is voidable under § 544(a). The Defendant is therefore left with, at best, an unsecured interest of indeterminate nature against the Debtor.

3. THE AFTERMATH OF THE FOREGOING: THE DEFENDANT'S CLAIM AND THE N.J. ORDER MUST BE STRICKEN; ALSO, ALL AFFIRMATIVE CLAIMS OF THE DEBTOR UNDER NEW JERSEY OR PENNSYLVANIA LAW MUST BE DISMISSED.

Our foregoing conclusion that the transfer of the Property, via the Transaction, was not sufficient to convey title to the Property to Gordon eliminates the Estate's claim, which is only for rent. In order to have a claim for rent, the Defendant must own the Property. This conclusion also moots any need for the Debtor to avoid any statutory "landlord's lien" which the Defendant may have against the Property.

The court does not now decide what sort of amended claim, if any, the Defendant could assert under 11 U.S.C. § 502(h).

The N.J. Order was obviously entered on the assumption that the Estate had a valid title to the Property. This assumption was valid as long as the "strong-arm" powers under bankruptcy law, pursuant to § 544(a), did not intervene. As we indicated at pages 609–610 *supra*, the Debtor could not have successfully challenged the validity of the Estate's interest in the Property on the ground of its lack of conformity to the pertinent Pennsylvania recording statutes unless and until it filed bankruptcy and asserted avoidance powers under § 544(a) while standing in the shoes of the trustee. The N.J. Court could certainly not have foreseen these circumstances and consequences, and its Order was in no sense invalid when it was entered. However, these consequences have now come to pass, and the assumptions present and relied upon when the N.J. Order was entered no longer exist. In light of these developments, the N.J. Order cannot survive.

The only remaining claims are the Debtor's requests, in Counts III and VIII of its Complaint, that we declare the Transaction to be a "loan" rather than a "sale," and that we award it damages on two theories: (1) the Estate anticipatorily breached the "loan agreement" between the parties by turning down the offer set forth in Diemer's August 19, 1988, letter; and (2) Gordon and the Estate have violated a New Jersey criminal usury statute, presumably N.J.STAT.ANN. § 2C:21–19a, and certain vaguely-referenced Pennsylvania usury laws.

One short answer to the Debtor's request that we declare the "true nature" of the transaction to be a "loan" is that we need not, and have no basis to, address this issue in light of the granting of relief avoiding the Estate's title and security interest in the Property and striking its claim. A second is our incredulity regarding Diemer's explanation of his reasons for his drafting the August 19, 1988, letter. We credit Kulzer's testimony that Kulzer

did not dictate this letter to Diemer, and that in fact Diener wrote the letter as a knowing and intelligent offer to resolve the muddled state of affairs of the status of the title to the Debtor's Property. In light of Diemer's willingness to offer $437,500 to extinguish the Estate's interest in the Property, it is difficult to understand how the present extinction of that interest with no additional payment by the Debtor could be deemed unconscionable, at least as to the Debtor.

■ The Agreement, the Lease Agreement, and the Re-purchase Agreement all recite that they are to "be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania." Since we believe that the location of the Property in Pennsylvania may well have justified application of Pennsylvania law under this state's " 'center of gravity' of the contract" test, even in the absence of contractual choice of law provisions, *see Neville Chemical Co. v. Union Carbide Corp.*, 422 F.2d 1205, 1211 (3d Cir.), *cert. denied*, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970), we are prepared to enforce the provision present in these documents. *See Lebeck v. William A. Jarvis, Inc.*, 145 F.Supp. 706, 727 & n. 67 (E.D.Pa. 1956), *aff'd in part & rev'd in part on other grounds*, 250 F.2d 285 (3d Cir.1957) (contractual provision selecting law of a state as controlling will be enforced if not violative of public policy or adopted to evade otherwise applicable law). *Cf. In re Diaz Contracting, Inc.*, 817 F.2d 1047 (3d Cir.1987) (forum selection clause is presumptively valid). We are therefore not prepared to apply a New Jersey criminal usury statute to any aspect of the facts of this case.

■ The application of any Pennsylvania usury law is problematic, for a number of reason. Firstly, limitations on the rate of interest charged to borrowers in business loans do not exist under Pennsylvania law. *See* 41 P.S. § 301(f)(v); *In re DiPietro*, 135 B.R. 773, 778 (Bankr.E.D.Pa. 1992); and *In re Jungkurth*, 74 B.R. 323, 329–31 (Bankr.E.D.Pa.1987), *aff'd sub nom. Jungkurth v. Eastern Financial*

*Services, Inc.*, 87 B.R. 333 (E.D.Pa.1988). Secondly, there is no specific evidence of how payments by the Debtor to Gordon and the Estate were allocated, such as would support a claim that the Debtor paid "excess interest" under the applicable Pennsylvania usury law, 41 P.S. § 502. *See In re Brown,* 134 B.R. 134, 146 (Bankr. E.D.Pa.1991). Finally, assuming *arguendo* that the Transaction was a loan, its terms are very unclear. Consequently, computation of interest paid would be guesswork. We again observe that we are not overly receptive to any claim of the Debtor that the transaction was unconscionable as to it, in light of our invalidation of the deed transfer and the Estate's security interest in the Property, and Diemer's previous willingness to pay much more than the Debtor has remitted in payments.

We therefore conclude that any claim of the Debtor against the Estate for monetary damages must be dismissed.

### E. CONCLUSION

An Order consistent with the conclusions reached in this Opinion will be entered.

### ORDER

AND NOW, this 13th day of March, 1992, after a trial of November 7, 1991, of the above adversary proceeding, and upon careful consideration of the substantial Proposed Findings of Fact and Proposed Conclusions of submitted by the respective parties, it is hereby ORDERED AND DECREED as follows:

1. Judgment is entered in part in favor of the Plaintiff–Debtor, CAPITAL CENTER EQUITIES ("the Debtor"), and against the Defendants, ESTATE OF WILLIAM GORDON ("the Estate"), MICHAEL KULZER and MARK G. WOLKOFF, EXECUTORS, as to Counts I, II, IV, V, VI, and VII of the Complaint.

2. Any purported transfer of the Capital Center by the Debtor to William Gordon is AVOIDED.

3. Any security interest claimed by the Estate in the said Capital Center is avoided.

4. The Proof of Claim filed by the Estate in this bankruptcy case (No. 1) is STRICKEN.

5. The Order of February 25, 1991, of the Superior Court of New Jersey, Camden County, Chancery Division, in Docket No. C–00025–91 is STRICKEN.

6. All other claims of the Debtor against the Defendants, including any claims for monetary damages, are DISMISSED.