In re U.S. PHYSICIANS, INC., (Jointly Administered with U.S. Medical Services of Pennsylvania, P.C., No. 98–34012DAS U.S. Medical Services of New Jersey, P.C., No. 98–34013DAS U.S. Rehabilitation Services of Pennsylvania, P.C., No. 98–34014DAS U.S. Medical Services of Delaware, P.A., No. 98–34023DAS), Debtors.

Bankruptcy No. 98–34011DAS.

United States Bankruptcy Court,
E.D. Pennsylvania,
Philadelphia Division.

July 29, 1999.

Gary M. Schildhorn, Adelman, Lavine, Gold and Levin, Philadelphia, PA, for Debtors.

Daniel M. Grauman, Bala Cynwyd, PA, for Trustee in U.S. Physicians Case.

Christine C. Shubert, Tabernacle, NJ, for Trustee in Other Cases.

Morton Brantzburg, Esquire, Klehr, Harrison, Harvey, Branzburg & Ellers, Philadelphia, PA, for Trustee Daniel M. Grauman.

Paul B. Maschmeyer, Ciardi, Maschmeyer & Karalis, P.C., Philadelphia, PA, for Trustee Christine C. Shubert.

Carl J. Greco, Carl J. Greco, P.C., Scranton, PA, for Movants.

Henry Dewerth–Jaffe, Pepper Hamilton, LLP, Philadelphia, PA, for HCFP Funding Inc.

Walter Weir, Jr., Weir & Partners, Philadelphia, PA, for Plaintiffs in Adv. No. 99–0225, raising a similar issue.

Frederic Baker, Ass't. U.S. Trustee, Philadelphia, PA.

### OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

## A. INTRODUCTION

The contested matter before us is in substance an attempt by former member doctors ("the Doctors") of affiliated Debtors which attempted to form a consolidated medical practice group, to separate themselves from that group upon its financial demise and thereby assert their sole right to assets previously transferred by them to the Debtors, notably the right to collect certain pre-petition accounts receivable generated by the Doctors' incorporated medical practice. The Doctors have utilized the means of a motion for relief from the automatic stay ("the Motion") to accomplish this end.

At bottom, this effort fails because the Doctors did not strictly adhere to prescribed contractual procedures in separating themselves from the Debtors, thus allowing the Debtors' trustees ("the Trustees"), standing in the shoes of the "ideal creditor," to successfully contest same. The Motion also fails under the terms of 11 U.S.C. § 362(d) of the Bankruptcy Code because the Doctors were unable to establish that they held a valid security interest under 13 Pa.C.S. § 9115 in their stock of their former practice ("the Stock"), which they had previously transferred to the Debtors in affiliating with them. The absence of a valid security interest eliminates 11 U.S.C. § 362(d)(2) as a basis for the Motion and the Doctors are unable to establish the requisite balance of hardships in their favor necessary to prevail as unsecured creditors under 11 U.S.C. § 362(d)(1).

We will therefore deny the Motion and allow the Trustees to continue to exercise their rights over the disputed assets.

## B. PROCEDURAL AND FACTUAL HISTORY

This Motion is the latest in a series of attempts by doctors previously affiliated with U.S. PHYSICIANS, INC. ("USP"), and the four companies affiliated to it which are listed in the above caption ("the Debtors"), to recover assets transferred to the Debtors upon the Debtors' financial collapse. A similar dispute involving other physicians is reported in *In re U.S. Physicians, Inc.*, 235 B.R. 367 (Bankr.E.D.Pa. 1999) (*"USPI"*). As is noted in *USPI*, at 370–71, having succeeded in its efforts to acquire numerous medical practices prior to obtaining a public stock offering ("the IPO") which it was contemplated would fund its large group practice, USP was ultimately unable to obtain the capital necessary to issue the IPO. That venture consequently failed. Many of the physicians who sold their practices to USP have filed claims as creditors in these cases, seeking various resolutions from the bankruptcy

court. Dr. Joseph G. Cesare, Dr. P. Christopher Metzger, Dr. Alice R. Coyle, and Dr. Jack F. Henzes, who formed a corporate practice and thereafter a successor corporation among themselves, the Movants now before us, are typical of those physicians believing themselves entitled to assert rights in assets of their former respective practices against the claims to same of USP.

The Debtors' bankruptcy petitions were initially filed, on October 30, 1998, as voluntary Chapter 11 cases. When financing necessary to preserve the Debtors' structure during the requisite unwinding process could not be obtained, these cases were, at a very early stage, converted to cases under Chapter 7 of the Code on November 9, 1998. Christine Shubert, Esquire, was appointed as interim trustee of all five Debtors on November 10, 1998. Daniel Grauman (with Shubert, "the Trustees") was elected as the permanent Chapter 7 trustee in the USP case on April 12, 1999, while Shubert remains as trustee in the other four cases.

The Movants filed the Motion before us on February 26, 1999. After agreed continuances from the original hearing date of March 25, 1999, and the next scheduled date of April 29, 1999, the matter was listed on June 22, 1999, with several proceedings arising out of this case, mostly involving challenges by numerous physicians groups to the asserted first priority secured claim to most of the Debtors' assets by its principal lender, HCFP Funding, Inc. ("HCFP").

At the hearing, which in fact took place on June 22, 1999, when we refused to allow a further requested continuance, one of the four Movants, Dr. Cesare, testified. The Trustees and HCFP ("the Objectors") joined to oppose the Motion, with Grauman taking the lead. A post-hearing scheduling order required simultaneous initial submissions on July 2, 1999, and replies on July 9, 1999.

It was established at the hearing that the Movants were the sole shareholders in a closely-held professional corporation and its successor. On July 30, 1997, they sold the Stock, consisting of all of the shares issued by their most recent incorporated practice, to USP in furtherance of USP's aforementioned plan to form a large physician practice management company. In the sale, the Movants exchanged the Stock for a combination of current cash and future payments. The future payments were represented by promissory notes ("the Notes") issued by USP to the Movants.

There were only four stock certificates ever issued by the Movants' medical practice corporations, and three of the four could not be found at the time of closing of the sale transaction. As a result, three of the Movants executed letter affidavits, attesting to the existence of the missing certificates; agreeing that they were "inducing" their practice to issue new certificates which would be "issued" to USP; and agreeing to indemnify their corporation from claims based on the lost certificates or the issuance of the new ones.

Completion of the sale was accompanied by the execution of numerous documents memorializing the terms agreed to by the parties to the transaction. Among the documents was a Stock Purchase Agreement ("the Purchase Agreement") and a Rider to the Purchase Agreement ("the Rider"). A term in the Rider provided an option for the Movants to repurchase the Stock in the event that the IPO failed to go forward as planned ("the Option"). A separate Pledge Agreement in which USP was the obligor was also executed, and it provided that, upon an event of default, "ownership of the Securities, free and clear of all liens, security interests, encumbrances and claims, [was to] automatically revert to [the Movants]." The Option included the following provisions, at paragraph 21:

(c) During the [the Exercise Period], Physicians who, in the aggregate, owned of record at least 66⅔% of the outstanding capital stock of each class of the Company on the date hereof (the "Threshold Number") may give written notice (containing their signatures) to USP (the "IPO Repurchase Notice") that they desire to repurchase the Shares 30 days after the date of the delivery of the IPO repurchase Notice (the "IPO Termination Date"). If the IPO Repurchase Notice is given the Physicians shall deliver to USP the Deliverables (as defined below) ... All Physicians who have signed the IPO Repurchase Notice shall jointly and severally be responsible and serve as surety and guarantor that the Deliverables are delivered no later than the IPO Termination Date.

(d) Except as provided in subparagraph 21(h), Deliverables means the Notes and the Common Shares. The Deliverables shall be delivered to USP on or before the IPO Termination Date. The portion of the Deliverables represented by the Common Shares shall be paid by the return to USP of all Common Shares beneficially owned by the Physicians (which shall equal the number of Common Shares issued to the Physicians by USP hereunder) together with executed stock powers with signature guarantee. Upon delivery of the Deliverables, all amounts of principal and interest due on the Notes shall no longer remain due, and the Notes will be delivered to USP on or before the IPO Termination Date and marked "Satisfied and Cancelled."

The Deliverables were further defined in the Rider, at ¶ 21(h), as "the Notes, the Common Shares, and all amounts paid to Physicians under the Notes through prepayment or otherwise, through the IPO Termination Date."

When USP's IPO did not occur as scheduled, the Movants were empowered to exercise the Option. In addition, the Movants allege that USP failed to submit the July 30, 1998, payment on the Notes, constituting an event of default under the

Pledge Agreement. However, the only step taken by the Movants to extricate themselves from the transaction was the dispatch of the following letter ("the Letter") of August 11, 1998, to USP's President:

> As you know, [USP] has failed to pay the most recent installment due under the ... Notes, ... and such failure has now continued for ten (10) days. Accordingly, you are hereby given written notice of the failure to pay as required.
>
> Moreover, in accordance with Paragraph 21 of the Purchase Agreement, with Rider, dated July 30, 1997, as amended, this letter is intended to serve as notice to [USP] that we desire to repurchase the shares of [our corporation] thirty (30) days after the date of delivery of this letter to you.
>
> We will contact [USP] in the coming weeks to complete the transaction in accordance with our respective obligations.

The Debtor received the Letter on August 14, 1998. Pursuant to paragraph 23(j) of the Rider, the effective date of any termination properly set in motion by a notice received on August 14, 1999, would be September 14, 1998. The thirty days elapsed, during which time the Movants took no further action, neither returning the Notes nor initiating any further contact with USP to discuss the Letter. Neither did a response ensue from USP or any of its representatives. Believing that they had complied with the requirements of the Option, the Movants took no further action at any other time, and resumed their practice if they had regained ownership of the Stock and were no longer affiliated with USP.

The Movants displayed perhaps excessive deference to the bankruptcy process in couching the Motion as a request to lift of the automatic stay in order that they might quiet title and eliminate any competing claims for the Stock or benefits which might attend its ownership. More typically, it is a debtor that will invoke the automatic stay as a layer of protection against a creditor's actions, even when other causes of action are present. *Compare USPI*, at 374–76. Mindful of their need for some basis to penetrate this layer of protection once it was invoked, the Movants undertook at the hearing to assert their status as that of creditors secured by their interests in the Stock, doubtlessly recognizing that secured status is an important element for a creditor to prove in relief from stay litigation. However, apparently rethinking the strength of their claim to secured status and the wisdom of casting their cause of action against the Debtor in this posture, they began their opening Brief with arguments that the Debtors have no continuing "property interest" in the Stock because the Movants either validly exercised the Option or were entitled to invoke the "event of default" provisions of the Pledge Agreement.

Treating the Movants' cause of action as a "pure" § 362(d) Motion, the Objectors responded that the record is devoid of evidence regarding either the value of the Stock or of the Debtor's outstanding obligations on the Notes. Absent this evidence, the Objectors argued that the Movants have not met their initial burden of demonstrating USP's lack of equity in the Stock for purposes of particularly § 362(d)(2) and § 362(d)(1). The Objectors further asserted that the Movants have not perfected the security interest they claim in the Stock. While mostly addressing the validity of the Movants' security interests in the Stock under the Uniform Commercial Code of Pennsylvania, 13 Pa.C.S. §§ 1101, *et seq.* ("the UCC"), the Objectors also argued that the Movants never properly terminated their relationship with USP, as specified in the Purchase Agreement, and therefore have no right to the return of the Stock, at least as against the Trustees standing in the shoes of the "ideal creditor" under 11 U.S.C. § 544.

## C. DISCUSSION

*1. The Movants Did Not Properly Exercise the Option, Since They Fulfilled Only One of Two Requirements in the Rider, and They Consequently Have No Ownership Claim in the Stock Deriving from the Option.*

■ The Movants argued at length that the Letter constituted the proper exercise of the Option pursuant to paragraph 21 of the Rider. In so arguing, they are compelled to contend that the language of the Letter effected an unequivocal notice which constituted a proper tender of performance of their obligations necessary to exercise the Option. They support this assertion by observing that both they and USP treated the Movants as having terminated their relationship with USP following the delivery of the Letter.

■ However, Dr. Cesare, the sole witness in the hearing for the Movants, admitted that the Movants never delivered the Notes to USP. According to the Movants' apparent analysis, the return of the Notes was rendered unnecessary because of USP's alleged default on the payment due July 30, 1998. However, while a default was a necessary condition to successfully invoke the Option, it was not a sufficient condition to do so. Moreover, the alleged "agreement" of USP that the Letter was sufficient to constitute an exercise of the Option is not decisive. The actions of the Debtor do not bind the Trustees. What is controlling is whether the Movants satisfied all of the prerequisites for exercising of the Option as set forth in the pertinent documents.

■ As we recently stated in *USPI,* at 374–75,

[t]he principle [that a contract should be interpreted according to the course of performance between the parties,] applies only if there is some degree of ambiguity regarding the meaning of the contract terms regarding which the course of performance is at issue. As we held in *In re St. Mary Hospital,* 101

B.R. 451, 461 (Bankr.E.D.Pa.1989), an unambiguous contract provision must be interpreted as it is written, not as the parties may have meant it or interpreted it. *See, e.g., Philadelphia, W. & B.R. v. Trimble,* 77 U.S. (10 Wall.) 367, 377, 19 L.Ed. 948 (1870); *In re Penn Central Transportation Co.,* 831 F.2d 1221, 1225–28 (3d Cir.1987); *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1009–14 (3d Cir.1980); *In re Temp–Way Corp.,* 82 B.R. 747, 751 (Bankr.E.D.Pa.1988); 1 [A. CORBIN, CORBIN ON CONTRACTS,] 104, at 464 (1963); and 4 [S. WILLISTON, A TREATISE ON THE LAW OF CONTRACTS,] 610, at 499–500 (3d ed. Jaeger 1961). *See also, e.g., In re St. Mary Hospital,* 117 B.R. 125, 131–32 (Bankr. E.D.Pa.1990).

The instant contractual language is clear and unambiguous in requiring performance of two steps by the Movants in order for them to properly exercise the Option. Both notice of the intent to repurchase *and* delivery of the Deliverables, the Notes (marked "satisfied and canceled") and Common Shares of USP, were required. *See the Rider,* ¶¶ 21(c), (d), quoted at pages 597 – 598 *supra.* The Movants performed only the first of these two requirements. The second requirement, delivery of the Deliverables, was neither attempted nor accomplished.

We do note that only part of the Deliverables could have been returned to USP. USP's filing for bankruptcy protection was triggered by its failure to issue a public stock offering, so there were no common shares of USP in existence for the Movants to deliver in fulfillment of the second requirement. However, this factor, while relieving the Movants' burden in part, does not work to relieve them from the further requirement that the Notes were to be marked as "Satisfied and Canceled" and returned to USP in order to complete the exercise of the Option. We observe that, without the return of the Notes, the Movants would have had a one-way exit from

the venture, permitting them to return to private practice while still having the ability to hold USP to payment obligations on the Notes.

Nor does it appear, from the four corners of the Letter, that the Movants deemed themselves to have effected the Option merely by sending the Letter and then acting as if its dispatch alone constituted a sufficient performance to effect an exercise of ·the Option. The last paragraph of the Letter spoke in terms of "complet[ing] the transaction in accordance with our respective obligations" in the "coming weeks." However, no further performances by the Movants were forthcoming. Therefore, on its face, the Letter, we think correctly, observes that further "obligations" attended the exercise of the Option.

In response to the argument that the Debtor at least passively accepted the Debtor's performance as sufficient to constitute an exercise of the Option, we remind the Movants that the Trustees possess extraordinary powers pursuant to 11 U.S.C. § 544(a), as we thusly explained in a factually-analogous setting in *In re Hunt's Pier Associates,* 143 B.R. 36, 49 (Bankr.E.D.Pa.1992):

> The Bankruptcy Code provides that the Trustee may avoid certain claims against the debtor's estate which, outside of bankruptcy, would not be avoidable. *See e.g., In re Capital Center Equities,* 137 B.R. 600, 609–10 (Bankr.E.D.Pa. 1992); and *In re Rice,* 133 B.R. 722, 728 (Bankr.E.D.Pa.1991). This result follows because these "strong-arm" provisions of the Code permit the trustee to stand in the shoes of a hypothetical "ideal" lien creditor or judgment creditor, or a bona fide purchaser of a debtor's real property. *Capital Center, supra,* 137 B.R. at 608.

The Trustees may therefore enforce the conditions of the Option necessary to terminate the Debtors' interests in the Stock, even though USP and the Debtors themselves, through nonfeasance, failed to do so.

The Movants appear to argue that they are nevertheless entitled to the "specific performance" of allowing them to exercise the Option as an appropriate remedy, citing *Eichbaum v. Sample,* 213 Pa. 216, 62 A. 837 (1906), in their support. The Movants appropriately contend that *Eichbaum* endorses the remedy of specific performance of forfeiture of stock where the matters in dispute are unique or difficult to value. It is true that *Eichbaum* involved a transaction somewhat similar to that between the Movants and USP. There, the defendant loaned money to the plaintiff in exchange for which the defendant held stock certificates as collateral to secure repayment of the loan. However, the facts of *Eichbaum* are distinct from the instant facts on two critical points. First, in *Eichbaum,* there was no written agreement between the parties. Second, the plaintiff had properly tendered his performance and the defendant had not yet done so. Years later in *Aldrich v. Geahry,* 360 Pa. 376, 381, 61 A.2d 843, 845 (1948), *Eichbaum* was cited for the principle that equity steps in only where there is no adequate remedy at law, no written agreement defined the payment terms, and the defendant refused to perform his part of the bargain despite the plaintiff's tender of the full payment before due.

In the instant factual setting, we have several documents which expressly define not only what constitutes a default, but also precisely what remedies are available upon default and the. conditions for exercise of those remedies. Thus, even if it can be argued that USP was in default of the Purchase Agreement, the Rider to that Agreement set forth a specific remedy for that default through exercise of the Option. Again, the Movants failed to perform a significant necessary step in exercising the Option's prescribed remedy.

We therefore conclude that the Movants did not properly and effectively exercise the Option. Therefore, the Trustees cor-

rectly argue that the rights of USP in the Stock were not to be extinguished at this juncture by the Movants.

*2. The Movants Did Not Obtain a Valid Security Interest in the Stock, Since They Did Not Obtain Delivery of Same, and Therefore They Cannot Assert the Status of Creditors of USP Whose Rights Against It Were Secured by the Stock.*

█ If the Movants had believed themselves capable of effectively arguing that they exercised the Option to recover title to the Stock prior to USP's bankruptcy filing, it would seem that they would have preferred to file a motion or proceeding simply declaring that the Trustees had no rights in the Stock rather than entering the thicket of obtaining relief from the automatic stay to effect a post-petition foreclosure of their rights. As we held in the prior headnote, the Movants could not sustain such an argument and hence accurately perceived that the Motion was necessary in order for them to foreclose the Trustees' interests in the Stock.

The Motion, as we noted previously, takes the form of a motion for relief from the automatic stay under 11 U.S.C. §§ 362(d)(1), (d)(2), which provide as follows:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> > (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
> > (2) with respect to a stay of an act against property under subsection (a) of this section, if—
> >
> > > (A) the debtor does not have an equity in such property; and
> > > (B) such property is not necessary to an effective reorganization.

The Movants correctly perceived that it was highly significant to the success of the Motion, under either § 362(d)(1) or § 362(d)(2), to establish their status as secured creditors in the context of the instant Chapter 7 liquidation cases. In such cases, the debts of secured creditors are satisfied first, and, following the satisfaction of administrative expenses and any other priority claims, any remaining funds are distributed among the unsecured creditors who have properly filed claims against the estate. Generally, it would defeat the purpose of this order of distribution to permit unsecured creditors to obtain relief from the automatic stay to assert their claims, thereby permitting them to act against property of the estate.

█ Unsecured creditors are generally relegated to asserting their claims under the bankruptcy claims process. *See In re U.S. Physicians, Inc.,* 1999 WL 496475, at *3 (Bankr.E.D.Pa. July 7, 1999); and *In re FRG, Inc.,* 121 B.R. 710, 714 (Bankr. E.D.Pa.1990). That is because actions by unsecured creditors in other forums would require expenditure of administrative resources of the estate to litigate in alternative forums. Therefore, allowing litigation by, as well as any recovery to, an unsecured creditor would tend to significantly reduce assets of the estate and undermine the ability of the secured creditors to satisfy the debts owed to them. Relief for unsecured creditors is therefore rarely granted in bankruptcy cases under 11 U.S.C. § 362(d). *See generally In re LaBrum and Doak,* 1998 WL 233749, at *5 (Bankr.E.D.Pa. May 8, 1998), citing *In re Metro Transportation Co.,* 82 B.R. 351, 353 (Bankr.E.D.Pa.1988); and *Hunt's Pier, supra,* 143 B.R. at 50. Hence, in order to assess the Movants' right to relief, it is essential that we determine whether the Movants possessed a valid and perfected security interest in the Stock, thus giving them special rights to regain the Stock pursuant to the terms of the Pledge Agreement.

Security interests arising pursuant to transactions conducted in Pennsylvania are usually governed by Article 9 of the UCC. *See* 13 Pa.C.S. §§ 9101, *et seq.* This Arti-

cle was among those updated in 1996 in bringing Pennsylvania into conformity with the latest revisions to the UCC. *See First Nat'l Bank of Palmerton v. Donaldson, Lufkin & Jenrette Securities Corp.,* 1999 WL 163606, at *7 FN1 (E.D.Pa. March 19, 1999); and R. Wittie, *Review of Legislative Developments Affecting U.C.C. Article 8 and Investment Securities,* 53 BUS. LAW. 1511, 1512 (1998).

The updates in Pennsylvania included a new section 9115 which sets forth, in part, the rights and responsibilities of parties participating in secured transactions involving "investment property." As defined in the statutory text, "investment property" means "a security, whether certificated or uncertificated." 13 Pa.C.S. § 9115(a). According to 13 Pa.C.S. §§ 9115(d)(1), (2), a security interest in investment property may generally be perfected either by control or by filing a financing statement. *Id.*

The Movants have designated 13 Pa.C.S. § 9115(d) as the statutory support for their claimed security interest in the Stock. Because only three of the four original stock certificates existed at the closing of the sale, the Movants argue that the stock interests in question are "uncertificated" securities. According to the Movants' interpretation of § 9115(d), perfection of an interest in such uncertificated securities may be accomplished by the ability to assert control over the securities, as well as by actual possession of the stock certificates, as was generally required under the "old" UCC, pursuant to 13 Pa.C.S. § 9304. The Movants further argue that "control" of the Stock shifted to them upon USP's defaults under the terms of the Notes, a point at which they believed it was possible for them to sell or otherwise transfer the Stock without USP's permission.

The Objectors rightly observe that the purpose and effect of § 9115 is only understood in coordination with definitions found elsewhere in the UCC. In order to understand what, exactly, constitutes "investment property," they contend that we must look to the definition of "security." "Security" is defined at 13 Pa.C.S. § 8102(a), as follows:

> Except as otherwise provided in section 8103 ... [a security is] an obligation of an issuer or a share, participation or other interest in an issuer or in property or an enterprise of an issuer ... (3) which: (i) is, or is of a type, *dealt in or traded on securities exchanges or securities markets* .... (emphasis added).

Furthermore, an uncertificated security is defined as "a security that is not represented by a certificate." *Id. See also* 13 Pa.C.S. § 9115 (cross-referencing definitions in a comment to Article 8 of the UCC).

No evidence was introduced to suggest that the Stock fits these definitions in the manner suggested by the Movants. First, the Movants admitted that the Stock is not publicly traded and represents shares in a closely-held corporation. As the Objectors point out, stock in a closely-held corporation is considered an "instrument," *see e.g. In re Fund Raiser Products Co.,* 163 B.R. 744, 748–49 (Bankr.E.D.Pa.1994), in which a security interest could be perfected only by possession under the 1991 version of the UCC, pursuant to 13 Pa.C.S. § 9305. Second, the Stock cannot be deemed "uncertificated securities" because all shares are accounted for and represented by stock certificates. Even the shares represented by the three missing certificates were issued as certificates that have never been formally canceled. Because the Stock is therefore not of the type of security defined in § 8102(a), a plain reading of the definitions renders the Movants' interpretation of § 9115 inaccurate.

Giving every consideration to the possibility that the Movants' interpretation has merit, we further examine the comments to § 8102 to determine if there remains room for interpretation of the intent of this legislation which would support their position. After this examination, we remain unpersuaded that the Stock qualifies under

the definition of a "security" for the purposes of § 9115.

The relevant portion of the comments reads as follows:

"Security." The definition of "security" has three components. First, there is the subparagraph (i) test that the interest or obligation be fully transferable, in the sense that the issuer either maintains transfer books *or the obligation or interest is represented by a certificate in bearer or registered form.* Second, there is the subparagraph (ii) test that the interest or obligation be divisible, that is, one of a class or series, *as distinguished from individual obligations of the sort governed by ordinary contract law or by Article 3.* Third, there is the subparagraph (iii) functional test, which generally turns on whether the interest or obligation is, or is of a type, dealt in or traded on securities markets or securities exchanges. There is, however, an "opt-in" provision in subparagraph (iii) which permits the issuer of any interest or obligation that is 'a medium of investment' to specify that it is a security governed by Article 8.

The divisibility test of subparagraph (ii) applies to the security—that is, the underlying intangible interest—not the means by which that interest is evidenced. Thus, securities issued in book-entry only form meet the divisibility test because the underlying intangible interest is divisible via the mechanism of the indirect holding system. This is so even though the clearing corporation is the only eligible direct holder of the security.

The third component, the functional test in subparagraph (iii), provides flexibility *while ensuring that the Article 8 rules do not apply to interests or obligations in circumstances so unconnected with the securities markets that parties are unlikely to have thought of the possibility that Article 8 might apply.* Subparagraph (iii)(A) covers interests or obligations that either are dealt in or traded on securities exchanges or securities markets, or are of a type dealt in or traded on securities exchanges or securities markets. The "is dealt in or traded on" phrase eliminates problems in the characterization of new forms of securities which are to be traded in the markets, even though no similar type has previously been dealt in or traded in the markets. Subparagraph (iii)(B) covers the broader category of media for investment, but it applies only if the terms of the interest or obligation specify that it is an Article 8 security. This opt-in provision allows for deliberate expansion of the scope of Article 8.

13 Pa.C.S. § 8102, Comment 15 (emphasis added).

Considering these comments, we first observe that the sole stock certificate available and produced for inspection at the hearing of June 22, 1999, reveals that the Stock was common stock issued in registered form. It therefore meets the subparagraph (i) test as a fully transferable obligation, as well as the subparagraph (ii) test as one of a class. However, it does not meet the subparagraph (iii) functional test requiring the securities therein referenced to be publicly traded. While the test suggests some measure of flexibility relative to the definition of securities traded on markets, we find that the revisions of 1996 only intended this provision to apply to "new forms" of securities. Common stock in a closely-held corporation is not likely to be confused with a "new form" of security.

Assuming, *arguendo,* that the Stock is either a certificated or an uncertificated stock of a type intended to fall under the dictates of § 9115(d), we can attempt to view the Movants' assertions from a slightly different perspective. We agree with Movants' statement that "[a] security interest in investment property may be perfected by control." 13 Pa.C.S. § 9115(d)(1). However, in examining the pertinent definitions, it can be ascertained that "control," "[w]ith respect to a certifi-

cated security, uncertificated security or security entitlement, [refers to] the meaning specified in section 8106 (relating to control)." 13 Pa.C.S. § 9115(a).

Examining § 8106(a), we find that "control" of a security depends into which of four categories the security falls. Of the four available, we have no reason to examine the definition relative to a "security entitlement," as that category has not been alleged in this case, nor does it appear applicable. Remaining are the categories of a "Certificated Security in Bearer Form," a "Certificated Security in Registered Form," or an "Uncertificated Security." However, as to each of these categories, there is a requirement of taking delivery of the stock certificates in order to perfect a security interest therein, as indicated by the following:

(a) "Control" of certificated security in bearer form.—A purchaser has "control" of a certificated security in bearer form *if the certificated security is delivered to the purchaser.*

(b) "Control" of certificated security in registered form.—A purchaser has "control" of a certificated security in registered form *if the certificated security is delivered to the purchaser and:*

(1) the certificate is endorsed to the purchaser or in blank by an effective indorsement; or

(2) the certificate is registered in the name of the purchaser, upon original issue or registration of transfer by the issuer.

(c) "Control" of uncertificated security.—A purchaser has "control" of an uncertificated security if:

(1) the uncertificated security *is delivered to the purchaser;* or

(2) the issuer has agreed that it will comply with instructions originated by the purchaser without further consent by the registered owner.

13 Pa.C.S. §§ 8106(a),(b), (c)(emphasis added).

Attempting to overcome these statutory pronouncements, the Movants argue that the requirement of "delivery" cannot be read too literally. They contend that what is meant thereby is merely an apparent ability to exercise control over the securities at issue. In the instant factual setting the Movants contend that their "Rights Upon Default," pursuant to Paragraph 7 of the Pledge Agreement, operated to automatically return ownership of the shares to them upon the occurrence of an event of default, and such reversion constituted their immediate ability to exercise control over the Stock. However, to exercise rights as a secured creditor of USP, the Movants were obliged to prove both a default triggering the exercise of their rights in the Stock *and* their valid security interest in the Stock. The method of perfection of the security interest in the Stock, as conveyed in the Pledge Agreement, is specified. The Stock is an "instrument." Therefore, perfection of the claimed security interest in it required, per the pertinent statutes, "delivery" of the stock certificates or their representative substitutes.

Moreover, we note that it was the Movants' own failure to obtain new certificates in furtherance of the Purchase Agreement which complicated their performance of the "delivery" requirement at the critical time between August and October, 1998. We therefore conclude that the Movants did not obtain the requisite delivery of the certificates, may not claim a perfected security interest in the Stock, and are therefore unsecured creditors of USP.

 Addressing, in a general sense, the burdens upon a creditor seeking relief from the automatic stay in a chapter 7 case in *In re Cabrillo,* 101 B.R. 443, 447 (Bankr. E.D.Pa.1989), we stated as follows:

A party seeking relief from the stay bears the burden of proof on the issue of the Debtor's equity in the property. 11 U.S.C. § 362(g)(1). While the party opposing the motion bears the ultimate burden of proof on all other issues, 11

U.S.C. § 362(g)(2), the party seeking relief bears an initial burden of producing evidence to show that it is entitled to relief. *See, e.g., In re Ward*, 837 F.2d 124, 128 (3d Cir.1988); *In re Purnell*, 92 B.R. 625, 632 (Bankr.E.D.Pa.1988); *In re Metro Transportation Co.*, 82 B.R. 351, 353 (Bankr.E.D.Pa.1988); *In re Stranahan Gear Co.*, 67 B.R. 834, 836–37 (Bankr.E.D.Pa.1986). *See also* 2 COLLIER [ON BANKRUPTCY,] ¶ 362.10, at 362–72 [ (15th ed.1989) ].

We also stated as follows in *Hunt's Pier*, *supra*, 143 B.R. at 50:

The alleged secured party bears the burden of proving the validity of its security interest in the debtor's property. *See In re Harris*, 115 B.R. 376, 377 (Bankr.M.D.Fla.1990); and *In re Grant Broadcasting of Philadelphia, Inc.*, 71 B.R. 376, 385–86 (Bankr.E.D.Pa.), *aff'd*, 75 B.R. 819, 822–23 (E.D.Pa.1987). If a bankruptcy court has a serious doubt about the validity of the movant's security interest in the debtor's property, this factor weighs heavily upon the court's determination of a § 362(d) motion. *See In re Cabrillo*, 101 B.R. 443, 451 (Bankr. E.D.Pa.1989); *In re Rice*, 82 B.R. 623, 626 (Bankr.S.D.Ga.1987); *In re Gurst*, 75 B.R. 575, 579 (Bankr.E.D.Pa.1987); *In re Paolino*, 72 B.R. 555, 558 (Bankr. E.D.Pa.1987); *In re Dennison*, 50 B.R. 950, 955 (Bankr.E.D.Pa.1985); and *United Companies Financial Corp. v. Brantley*, 6 B.R. 178, 185 (Bankr. N.D.Fla.1980).

We further stated, at *id.* that

relief under § 362(d)(2), requiring, as it does, a debtor's lack of equity in the property regarding which relief is sought, is only appropriately granted when the movant has a security interest in that property. Even as to § 362(d)(1), a "valid secured status, while not a prerequisite, is a very important factor to be considered in deciding whether a moving party is entitled to relief from the automatic stay per 11 U.S.C. § 362(d)." *In re Tashjian*, 72 B.R. 968, 972 (Bankr.E.D.Pa.1987).

■ The instant Movants, being unable to convince us that they are enforcing a valid security interest in USP's property, are thrust into the unhappy posture of unsecured creditors. Relief from the automatic stay is available to unsecured creditors, under § 362(d)(1), only if the "balance of hardships" tips in the movant's favor. *See Metro Transportation, supra*, 82 B.R. at 353; *In re Cherry*, 78 B.R. 65, 68–69, 72 (Bankr.E.D.Pa.1987); and *In re Ronald Perlstein Enterprises, Inc.*, 70 B.R. 1005, 1009–10 (Bankr.E.D.Pa.), *appeal dismissed*, C.A. No. 87–2364 (E.D. Pa. June 25, 1987).

Thus, the Movants are unsecured creditors who can obtain relief only by making a "strong showing" that the "balance of hardships" tips in their favor. Here, the Movants rested heavily on unsupported assertions that the Debtor lacks equity in the Stock. The Movants' heavy reliance on the absence of the Debtor's equity in the Stock would only be meaningful if it were supported by credible information regarding the value of the Stock and the related outstanding debt on the Notes which it was to secure. However, such evidence, as the Objectors point out, was not present in this record.

■ Moreover, even assuming *arguendo* that the Debtor's total lack of equity in the Stock were convincingly proven, we observed, in *Perlstein, supra*, 70 B.R. at 1008, that unsecured creditors are generally entitled to relief only where they have demonstrated that the debtor had engaged in morally culpable conduct and the creditor was barred from collection of valid judgments already in its favor unless the stay were lifted. The Movants have not established that the balance of hardships has tipped in their favor merely by asserting their perceived entitlement to specific performance of the Option, as opposed to proving actual hardships which they will suffer if relief is denied. If the Motion is denied, it appears that the Mov-

ants will simply share the same financial status with the other frustrated physicians who were former members of the failed USP medical group.

Having examined the available arguments, we find that the Movants are not entitled to relief on the basis of the record before us. We therefore exercise our discretion in favor of denying the Motion before us. *See In re Holtkamp,* 669 F.2d 505, 507 (7th Cir.1982); *In re Foxcroft Square Co.,* 184 B.R. 671, 677 (E.D.Pa. 1995) (GAWTHROP, J.); and *In re Shariyf,* 68 B.R. 604, 606–07 (E.D.Pa.1986) (J. KELLY, J.).

## D. CONCLUSION

Accordingly, an order denying the instant Motion will be entered.