In re Jerry A. PFAUTZ and Suzanne Pfautz, Debtors.

No. 01–60164.

United States Bankruptcy Court, W.D. Missouri.

July 5, 2001.

---

31. See Nelson v. Scala, 192 F.3d 32, 35 (1st Cir.1999).

Robert V. Groce, Springfield, MO, for debtors.

Jeff Love, Greene & Curtis, Springfield, MO, for Liberty Bank.

Thomas J. O'Neal, Shughart Thomson & Kilroy, Springfield, MO, for trustee

Randall T. Oettle, Murphy, Tobben & Wasinger, L.C., St. Louis, MO, for Associates Commercial Corp., Inc.

### MEMORANDUM OPINION

ARTHUR B. FEDERMAN, Chief Judge.

The Chapter 7 trustee (the Trustee) filed a motion to compel Liberty Bank to turn over certain uncertificated securities, owned by debtors Jerry and Suzanne Pfautz, in which Liberty Bank claims a security interest. Though this motion is related, in essence, to the issue of the perfection and priority of Liberty Bank's lien, the Trustee did not file an adversary proceeding as required by Rule 7001(2) of the Federal Rules of Bankruptcy Procedure. Liberty Bank did not, however, object, so I will treat this matter as an adversary proceeding. This is a core proceeding under 28 U.S.C. § 157(b)(2)(K) over which the Court has jurisdiction pursuant to 28 U.S.C. § 1334(b), 157(a), and 157(b)(1). The following constitutes my Findings of Fact and Conclusions of Law in accordance with Rule 52 of the Federal Rules of Civil Procedure as made applicable to this proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

### ISSUE PRESENTED

Debtors granted Liberty Bank a security interest in uncertificated securities. Liberty Bank and the debtors established a loan collateral account to hold the securities. The loan collateral account is administered by a transfer agent designated by the issuer of the securities. The transfer agent will only release the securities upon instructions from Liberty Bank. In order to perfect a security interest in uncertificated securities under Missouri law the secured party must exercise control over the securities. Control is defined as having the power to sell the securities without the consent of the owners. The Third Party Pledge Agreement grants Liberty Bank the authority to dispose of the securities in the event of default, but does not specifically say that Liberty Bank can sell the securities without the consent of the debtors. Did debtors agree to allow Liberty Bank to sell the securities without their consent when they signed the Third Party Pledge Agreement, thus granting Liberty Bank control of the securities?

### DECISION

The language in the Third Party Pledge Agreement authorizes the secured party to dispose of the collateral in the event of default. By signing the Agreement, the debtors agreed to allow Liberty Bank to sell the uncertificated securities without their consent. Thus, Liberty Bank properly perfected its security interest.

### FACTUAL BACKGROUND

Sometime prior to January of 1998, debtors acquired 289.786 shares of Guardian Park Avenue Fund–A (Guardian), Account Number 52576–3, in the form of

uncertificated securities (the Uncertificated Securities). On January 14, 1998, debtors executed a "Third Party Pledge Agreement" in which they granted Liberty Bank a security interest in the Uncertificated Securities. On May 1, 1998, debtors, Liberty Bank, and State Street Bank and Trust Company (State Street), as the transfer agent for Guardian, established a separate Loan Collateral Account by executing a Loan Collateral Account Establishment Request for Recording of Assignment as Security (The Request). The debtors, a vice-president of Liberty Bank, and the Client Relations Officer for State Street signed the Request.[1]

On January 23, 2001, debtors filed a Chapter 7 bankruptcy petition. As of December 31, 2000, the Uncertificated Securities had a market value of $11,933.39. On February 14, 2001, Liberty Bank filed a motion to lift the automatic stay to allow it to foreclose its security interest in the Uncertificated Securities. The Trustee filed a response in which he claimed that Liberty Bank had failed to prove its security interest was perfected. On March 21, 2001, this Court held a hearing on Liberty Bank's motion, which it then continued at the request of the parties to allow counsel for Liberty Bank to obtain additional documentation of perfection. On April 4, 2001, the continuation date, the parties again requested additional time, and the hearing was continued to April 25, 2001. On April 25, 2001, counsel for Liberty Bank announced that he would withdraw his motion to lift the automatic stay until such time as the parties could resolve the perfection issue. On May 9, 2001, the Trustee filed this motion for an Order compelling Liberty Bank to turn over the Uncertificated Securities. On May 30, 2001, this Court held a hearing on the motion to compel turnover. At the hearing, counsel for Liberty Bank requested an opportunity to depose by telephone a representative of the transfer agent concerning the procedures followed by Liberty Bank and such transfer agent. The Trustee did not object to this request. The Court, therefore, allowed the parties ten days within which to conduct a telephone deposition. On June 6, 2001, the Trustee and counsel for Liberty Bank deposed Traci Connery. Ms. Connery is a division manager for National Financial Data Services (NFDS), a subsidiary of State Street, and the servicing agent, or recordkeeping agent, for Guardian. Ms. Connery testified that NFDS maintains Guardian's mutual fund accounts. Ms. Connery also testified as to the procedures NFDS uses to establish a loan collateral account, and the procedure for redeeming any uncertificated securities subject to a security interest. Ms. Connery stated that NFDS transferred the Uncertificated Securities into the loan collateral account on June 9, 1998, and that, since that time, the loan collateral account has contained a "stop transfer," which freezes the assets. Ms. Connery also testified that NFDS would only act upon instructions from Liberty Bank to release the collateral held in the account. She further stated that the release does not require the signature of the debtors. The Trustee objected to some of Ms. Connery's replies. On June 11, 2001, counsel for Liberty Bank submitted the transcript, and this Court is now prepared to rule.

## DISCUSSION

Uncertificated securities are securities that are not represented by certificates.[2] Pursuant to the Uniform Commercial Code, uncertificated securities are defined as investment property:

---

1. Bank's Ex. # 1.

2. Mo.St.Ann. § 400.8–102(a)(18).

(f) **"Investment property"** means:

(i) A security, whether certificated or uncertificated.[3]

A secured party perfects its security interest in uncertificated securities by controlling the securities:

(4) Perfection of a security interest in investment property is governed by the following rules:

(a) A security interest in investment property may be perfected by control.[4]

A purchaser, or secured party,[5] has control of an uncertificated security if it has accepted delivery, or if the issuer agrees to comply with the purchaser's instructions without consent from the registered owner:

(c) A purchaser has "control" of an uncertificated security if:

(1) The uncertificated security is delivered to the purchaser; or

(2) The issuer has agreed that it will comply with the instructions originated by the purchaser without further consent by the registered owner.[6]

Liberty Bank does not contend that it has accepted delivery of the Uncertificated Securities by becoming the registered owner. The issue, therefore, is whether Liberty Bank can demand that Guardian, or its transfer agent, redeem or dispose of the Uncertificated Securities without regard to the Pfautzes' wishes. The Trustee contends that neither the Third Party Pledge Agreement nor the Loan Collateral Account contains a provision wherein the is-

suer agrees to comply with instructions from Liberty Bank without consent of the debtors. Liberty Bank argues that it controls the loan collateral account and is, therefore, perfected, since the issuer will respond only to its instructions.

I begin with the exhibits from both the trial and the deposition. The Third Party Pledge Agreement is signed by Jerry and Suzanne Pfautz, and it purports to grant Liberty Bank a security interest in "MUTUAL FUND ACCT # 52576."[7] No one disputes that Mutual Fund Acct. # 52576 is the Guardian Fund Account. The Pledge Agreement spells out the rights of Liberty Bank as the secured party and provides that:

Pledgor agrees that Secured Party may at any time, whether before or after the occurrence of an Event of Default and without notice or demand of any kind, (i) notify the obligor on or issuer of any Collateral to make payment to Secured Party of any amount due or distributable thereon, (ii) in Pledgor's name or Secured Party's name enforce collection of any Collateral by suit or otherwise, or surrender, release or exchange all or any part of it, or compromise, extend or renew for any period any obligation evidenced by the Collateral, (iii) receive all proceeds of the Collateral, and (iv) hold any increase or profits received from the Collateral as additional security for the Obligations, except that any money received from the Collateral shall, at Secured Party's option, be applied in reduction of the Obligations, in such order

---

**3.** Mo.St.Ann. § 400.9–115(1)(f)(i) (Supp. 2001).

**4.** Mo.St.Ann. § 400.9–115(4) (Supp.2001).

**5.** *See* Mo.St.Ann. § 400.1–201(32) and (33), which defines a purchaser as one who takes by purchase, and defines purchase to include "taking by sale, discount, negotiation, mortgage, pledge, lien, issue or re-issue, gift or any

other voluntary transaction creating an interest in property."

**6.** Mo.Stat.Ann. § 400.8–106(c) (Supp.2001); *In re U.S. Physicians, Inc.*, 236 B.R. 593, 604 (Bankr.E.D.Pa.1999).

**7.** Trial Ex. # 2.

of applications as Secured Party may determine, or be remitted to Debtor.[8]

In this document the debtors grant to Liberty Bank alone the right to instruct Guardian, as the issuer of the collateral, to sell the Uncertificated Securities.

Ms. Connery testified that in order to perfect a security interest in Uncertificated Securities, both the registered owner and the secured party must request the establishment of a loan collateral account. It is undisputed that Liberty Bank and the Pfautzes made such a Request. The Request identifies the collateral as the Guardian Park Avenue Fund, Account Number 52576–3.[9] In the Request, the Pfautzes instruct State Street, as the Fund's transfer agent, to record the Guardian shares pledged, along with Liberty Bank's security interest, on the books and records of the Fund and on the initial transaction statement. The Request also contains the following instructions:

> transfer such shares into separate Loan Collateral Account . . . registered on the books and records of the Fund in the following manner:
> 1) LOAN COLLATERAL ACCOUNT
> 2) LIBERTY BANK PLEDGEE
> 3) JERRY A. PFAUTZ AND SUZANNE PFAUTZ Sharehold(s)/Pledgor(s)
> 4) 4133 N HAVEN SPRINGFIELD MO 65803 [10]

The Request states that the instructions contained within the Request cannot be amended or terminated without the prior written consent of Liberty Bank, and that Liberty Bank's rights shall be in accordance with the procedures established and in effect between the Fund and State Street.[11] The Request directs the issuer to distribute the Uncertificated Securities to a Loan Collateral Account.[12] Finally, the Request provides that "[e]xecution and return of this Request of Assignment as Security by State Street shall serve as notice that State Street has recorded the Pledge and security interest herein referenced on the books and records of the Fund as required under the applicable provisions of the Uniform Commercial Code."[13] The Request contains the signature of one Wilma Collado, Client Relations Officer for State Street.

During Ms. Connery's deposition, she testified that Wilma Collado is her manager at NFDS, and that Ms. Collado is also a vice-president of Boston Financial Services, a parent company of NFDS.[14] She also testified that NFDS follows the written procedures of their parent company, Boston Financial, when establishing a loan collateral account. The Trustee objected to Ms. Connery's testimony regarding the relationship between State Street and NFDS and the relationship between NFDS and Boston Financial. I find, however, that the Trustee offered no evidence to contradict Ms. Connery's testimony that NFDS is a subsidiary of State Street and, as such, is the record keeping agent for Guardian. I also find it relevant that State Street designated Ms. Connery as its representative to testify to the procedures it follows as the transfer agent for Guardian.

At Ms. Connery's deposition, Liberty Bank offered a document titled "ASSIGN-

---

8. *Id.* at ¶ 3.

9. Trial Ex. # 1.

10. *Id.*

11. *Id.*

12. *Id.*

13. *Id.*

14. Depo, pg. 18, ln. 18 and pg. 19, ln. 11.

MENT OF ACCOUNT AND ESTABLISHMENT OF LOAN COLLATERAL ACCOUNT." [15] Part I of this document sets forth the procedure for assigning an account or establishing a loan collateral account. It provides as follows:

> The shareholder(s) and account officer of the lending institution ... [shall] complete three copies of the *Assignment of Securities Account and Control Agreement* and the *Request for Recording of Assignment as Security,* Section One, and return three signed originals to Boston Financial. These forms serve as a request from the shareholder to transfer the indicated number of shares into a separate Loan Collateral Account and to record the security interest on the books and records of the Fund. All signatures must be guaranteed.[16]

The Trustee objected to the admission of this document on the grounds that it is the form used by Boston Financial, not NFDS. Ms. Connery, however, testified that NFDS, as a subsidiary of Boston Financial, uses its forms and follows its procedures. The Trustee offered no evidence to dispute Ms. Connery's statement. I again find that the Trustee, as the movant here, has the burden of proof in this matter.[17] And the issuer's transfer agent apparently recognizes the procedures established by Boston Financial, as Ms. Connery testified that the loan collateral account is frozen, and only Liberty Bank can release the freeze.[18] According to the procedure set forth, the Request must identify the account, the name of the pledgee, the shareholder's name, and the shareholder's address. I find that Trial Ex. # 1 contains this information. Finally, upon receipt of the documents, the issuer shall:

1a) Establish a Loan Collateral Account.

1b) Reinvest distributions to the Loan Collateral Account or establish a special mail file to the shareowner as indicated on the Request for Recording form.

1c) No privileges are carried over or established.

1d) Transfer shares from the assignor's account to the Loan Collateral Account.

1e) Place a Stop Transfer on the Loan Collateral Account.

1f) Code the assignor's original account Non Purge Y so that it will be available for transfer deposit when the collateral shares are released.[19]

Ms. Connery testified that NFDS followed all of these procedures. She stated, "[W]e transferred the account into the loan collateral account on June 9, 1998, and we have had a stop transfer, which freezes the assets in that account since that time, and have not removed it." [20] She further testified that NFDS would only release the collateral in the loan collateral account upon instructions of Liberty Bank.[21] Based upon the language in the Request and the Third Party Pledge Agreement, I find that the Pfautzes granted Liberty Bank the

---

**15.** Depo Ex. 2.

**16.** *Id.*

**17.** *See In re Fund Raiser Products, Co.,* 163 B.R. 744, 748 (Bankr.E.D.Pa.1994) (finding that the party contesting the proper perfection of a security interest in stock bears the burden of proof as to that issue, while the secured party has the initial burden of production). *See also Chicago Title & Trust Co. v. Central Trust Co. of Illinois (In re Mossler Co.),* 239 F.

262, 265 (7th Cir.1917) (holding that the trustee bears the burden of proof as to whether a preference occurred).

**18.** Depo, pg. 13, ln. 8–9.

**19.** Depo Ex. # 2.

**20.** Depo, pg. 10, lns. 4–8.

**21.** *Id.,* pg. 15, lns. 22–23.

right to sell the Uncertificated Securities upon their default, and, thus, they consented to the possibility of such a sale. That constitutes control pursuant to section 400.8–106(c) of Missouri's Revised Statutes. I, therefore, find that Liberty Bank properly perfected its security interest in the Uncertificated Securities, and I will deny the Trustee's motion for turnover.

An Order in accordance with this Memorandum Opinion will be entered this date.